## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

KEVIN FOX and MELISSA FOX,

   Plaintiffs,

    v.

JEFFREY TOMCZAK,
DETECTIVE EDWARD HAYES,
DETECTIVE MICHAEL GUILFOYLE,
DETECTIVE SCOTT SWEARENGEN,
DETECTIVE JOHN RUETTIGER,
DETECTIVE BRAD WACHTL,
DETECTIVE DAVID DOBROWSKI,
CHIEF DEPUTY JOHN MOSS,
DEPUTY CHIEF NICK FICARELLO,
LIEUTENANT DANIEL TAPPER,
WILL COUNTY SHERIFF PAUL KAUPAS,
RICHARD WILLIAMS, MARY JANE PLUTH,
OFFICER JEANETTE BISHOP-GREEN,
and WILL COUNTY,

   Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. 04 C 7309

Judge John W. Darrah

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiffs, Kevin Fox and Melissa Fox, bring this civil suit against former Will County

State's Attorney Jeffrey Tomczak, Detective Edward Hayes, Detective Michael Guilfoyle,

Detective Scott Swearengen, Detective John Ruettiger, Detective Brad Wachtl,

Detective David Dobrowski, Chief Deputy John Moss, Deputy Chief Nick Ficarello,

Lieutenant Daniel Tapper, Mary Jane Pluth, Richard Williams, Sheriff Paul Kaupas,

Officer Jeanette Bishop-Green, and Will County.[1]  Plaintiffs' Fifth Amended Complaint

---

[1]  Between 2001 and 2004, Tomczak was the elected and acting Will County State's
Attorney.  (Tomczak's 56.1(a)(3) at ¶ 2).  Defendants Edward Hayes, Michael Guilfoyle,
Scott Swearengen, John Ruettiger, Brad Wachtl, David Dobrowski, John Moss, and
Nick Ficarello  (collectively, the "Detectives") were detectives employed by the Will County

("Complaint") contains twelve counts. Kevin Fox alleges: violation of due process pursuant to § 1983 (Count I); false arrest pursuant to § 1983 (Count II); state law claims for: malicious prosecution (Count III); intentional infliction of emotional distress (Count IV); false imprisonment (Count V); defamation (Count VI); and violation of the Illinois eavesdropping statute (Count XII). Melissa Fox alleges loss of consortium (Count VII) and intentional infliction of emotional distress (Count VIII). Kevin and Melissa Fox both allege conspiracy (Count IX), indemnification (Count X), and *respondeat superior* liability (Count XI). Currently before the Court are: (1) the Will County Defendants' – Edward Hayes, Michael Guilfoyle, Scott Swearengen, John Ruettiger, Brad Wachtl, David Dobrowski, Richard Williams, Mary Jane Pluth, Will County Sheriff Paul Kaupas, and Will County's – Motion for Partial Summary Judgment; (2) Defendant Jeffrey Tomczak's Motion for Summary Judgment on Counts I - IX of the Fifth Amended Complaint; and (3) Defendant Richard Williams' Motion for Summary Judgment.

---

Sheriff's Department. (Will County's 56.1(a)(3) at ¶ 2; Tomczak's 56.1(a)(3) at ¶ 3; Williams' 56.1(a)(3) at ¶ 10; Fifth Amended Complaint at ¶ 9). Lieutenant Daniel Tapper was employed as a Lieutenant by the Will County Sheriff's Department at all times relevant to Plaintiffs' Complaint. (Williams' 56.1(a)(3) at ¶ 11). Defendant Mary Jane Pluth was employed by the Will County State's Attorney's Children's Advocacy Center as a forensic interviewer. (Will County's 56.1(a)(3) at ¶ 4; Tomczak's 56.1(a)(3) at ¶ 4). Williams, a polygraph examiner, was paid by his employer, the Cook County Sheriff's Police, at all times relevant to Plaintiffs' Complaint. (Williams'56.1(a)(3) at ¶ 3; Tomczak's 56.1(a)(3) at ¶ 5). Defendant Paul Kaupas, at all relevant times, was the Sheriff of Will County. (Will County's 56.1(a)(3) at ¶ 5). Officer Jeanette Bishop-Green was a correctional officer at the Will County Jail at all relevant times. (Fifth Amended Complaint at ¶ 12). Defendant Will County is a governmental entity in the State of Illinois. (Will County's 56.1(a)(3) at ¶ 6).

## UNDISPUTED FACTS[2]

This civil suit arises out of the investigation of the murder of three-year-old Riley Fox, who was murdered in June 2004. (Will County's 56.1(a)(3) at ¶ 1). Kevin Fox, the father of Riley and Tyler Fox and the husband of Melissa Fox, was arrested for Riley's murder in late-October 2004. (Will County's 56.1(a)(3) at ¶ 1). On June 17, 2005, State's Attorney Glasgow withdrew the charges against Kevin Fox when it was determined that DNA evidence found in Riley Fox's vagina did not match Kevin Fox's DNA. (Will County's 56.1(a)(3) at ¶ 1).

### The Events of June 5-6, 2004

On June 5, 2004, Melissa Fox traveled from the Fox residence in Wilmington, Illinois, to Chicago, Illinois, where she planned to stay overnight because she was participating in a walk benefitting breast cancer research on June 6, 2004. (Tomczak's 56.1(a)(3) at ¶ 17; Will County's 56.1(a)(3) at ¶ 8).

---

[2] Plaintiffs have moved to strike a number of Tomczak's and the Will County Defendants' factual assertions [Docket # 264, #241] because the Defendants' statements of fact were neither short nor concise and consisted of compound factual assertions. The application of the Local Rules is discretionary, *see FTC v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 633 (7th Cir. 2005). While Defendants did violate L.R. 56.1, so did the Plaintiffs, whose own statements of additional facts cannot be considered concise. Further, the other statements by the parties generally clarified the numerous contested issues. Plaintiffs' motions to strike are therefore denied.

Tomczak and the Will County Defendants have also filed several motions to strike [Docket # 274, #275] portions of Plaintiffs' 56.1(b)(3)(B) statements of additional facts, Plaintiffs' response to Defendants' statement of material facts, and the affidavits offered in support. Specifically, Tomczak and the Will County Defendants assert that Plaintiffs failed to comply with the applicable Local Rule because the affidavits contain inadmissible hearsay, the witnesses were not deposed (and, in some cases, disclosed by Plaintiffs), are unsupported by the facts, and/or lack proper foundation. To the extent Plaintiffs' statements and responses violate Local Rule 56.1, they have been disregarded.

3

On June 5, 2004, Kevin Fox also had plans to go to Chicago. Kevin Fox dropped off his two children, Riley and Tyler Fox, at the home of his mother-in-law, Sandi Rossi, and drove to Chicago with his wife's brother, Tony Rossi, to attend a concert. (Tomczak's 56.1(a)(3) at ¶ 18; Will County's 56.1(a)(3) at ¶ 7; Will County's 56.1(a)(3) at ¶ 11). At the concert in Chicago, Kevin Fox consumed approximately five beers. (Tomczak's 56.1(a)(3) at ¶ 19). Following the concert, Kevin Fox and Tony Rossi returned from Chicago; and they went in search of a party, which they were not able to find. (Tomczak's 56.1(a)(3) at ¶ 20). The two then returned to Sandy Rossi's home, after 1:00 a.m., in order for Kevin Fox to pick up his children. (Tomczak's 56.1(a)(3) at ¶ 20; Will County's 56.1(a)(3) at ¶ 12). The sleeping children were carried to Kevin Fox's car, a Ford Escape. (Tomczak's 56.1(a)(3) at ¶¶ 20, 76; Will County's 56.1(a)(3) at ¶¶ 13, 51). Kevin Fox then made the five-minute drive to his home with the children. (Tomczak's 56.1(a)(3) at ¶ 20; Will County's 56.1(a)(3) at ¶ 13).

When Kevin Fox arrived home, he carried the sleeping children from the car into the house and placed them both in the living room. Riley was placed on the couch; and Tyler, on the chair. (Tomczak's 56.1(a)(3) at ¶ 21). Kevin Fox then had a cigarette on his front porch, went back inside the house, and locked the front door. (Tomczak's 56.1(a)(3) at ¶ 22). Kevin Fox went to bed at approximately 2:30 a.m. (Tomczak's 56.1(a)(3) at ¶ 22; Will County's 56.1(a)(3) at ¶ 14).

Early on the morning of June 6, 2004, at about 6:45 a.m., Russ Gilmour, a retired police officer who was the Fox's neighbor, noticed that both of the front doors of the Fox residence were open. (Tomczak's 56.1(a)(3) at ¶ 24; Will County's 56.1(a)(3) at ¶ 17).

Before 8:00 a.m., on June 6, 2004, Kevin Fox was awakened by his son, Tyler. (Tomczak's 56.1(a)(3) at ¶ 25(a); Will County's 56.1(a)(3) at ¶ 18). Tyler Fox told his father that he had awakened and found Riley missing. (Tomczak's 56.1(a)(3) at ¶ 25(a)). After entering the living room, Kevin Fox noticed Riley was missing, and both front doors of the house were open. (Tomczak's 56.1(a)(3) at ¶ 25(b); Will County's 56.1(a)(3) at ¶ 18).

Kevin Fox began to search the interior of the house, which was small enough that it could be vacuumed using a single electrical outlet, beginning with the back bedroom. (Tomczak's 56.1(a)(3) at ¶¶ 26-27; Will County's 56.1(a)(3) at ¶¶ 19, 23). At this time, Kevin Fox was not "freaking out," even though Riley "didn't wander" and "it was very unlikely Riley would get up and go." (Tomczak's 56.1(a)(3) at ¶ 27). After Kevin Fox searched the entire interior of the house, he went outside through the front doors and began to walk/run to his next-door neighbor's house to see if Riley was there; but he turned around because he thought it was too early to knock on their door. (Tomczak's 56.1(a)(3) at ¶ 28; Will County's 56.1(a)(3) at ¶ 20). Kevin Fox then returned to his house, looked up the neighbor's telephone number in the Wilmington telephone book, and called the neighbor. (Tomczak's 56.1(a)(3) at ¶ 28; Will County's 56.1(a)(3) at ¶ 21). The neighbor told Fox that Riley was not there. (Tomczak's 56.1(a)(3) at ¶ 28; Will County's 56.1(a)(3) at ¶ 22). Then Kevin Fox searched the house again, looked out the kitchen window, but did not go out the back door at that time. (Tomczak's 56.1(a)(3) at ¶ 29; Will County's 56.1(a)(3) at ¶ 22). More than 30 minutes after discovering Riley missing, Kevin Fox dialed 411 directory assistance to ask for the Wilmington Police Department non-emergency telephone

number. (Tomczak's 56.1(a)(3) at ¶ 30; Will County's 56.1(a)(3) at ¶ 24). Kevin Fox then called the non-emergency telephone number to report Riley missing. (Tomczak's 56.1(a)(3) at ¶ 30; Will County's 56.1(a)(3) at ¶ 24). Kevin Fox did not call his wife, Melissa, or his parents to tell them Riley was missing. (Tomczak's 56.1(a)(3) at ¶ 33; Will County's 56.1(a)(3) at ¶ 28).

The telephone call was received by Detective Todd Lyons of the Wilmington Police Department and recorded. (Tomczak's 56.1(a)(3) at ¶ 31).[3] After answering the call and hearing the report of Riley Fox's disappearance, Detective Lyons proceeded to the Fox residence. (Tomczak's 56.1(a)(3) at ¶ 31).

Melissa Fox first learned that Riley was missing when she called Kevin Fox around 9:30 a.m. (Tomczak's 56.1(a)(3) at ¶ 34). Upon learning of Riley's disappearance, Melissa Fox began crying hysterically and started vomiting. (Tomczak's 56.1(a)(3) at ¶ 34). Melissa Fox arranged to return home immediately. (Will County's 56.1(a)(3) at ¶ 29). Upon her arrival in Wilmington, Melissa Fox immediately proceeded to the Fox residence on Outer Drive and located Kevin Fox nearby. (Tomczak's 56.1(a)(3) at ¶ 35). Melissa Fox asked Kevin Fox if he had "done something stupid." (Tomczak's 56.1(a)(3) at ¶ 35; Will County's 56.1(a)(3) at ¶ 30). Melissa Fox also told Kevin that he "better not lie to me." (Tomczak's 56.1(a)(3) at ¶ 36; Will County's 56.1(a)(3) at ¶ 31).

---

[3] Detective Dobrowski, who as a deputy sheriff has taken at least 100 calls as a radio-room operator, testified that in eighteen years he has never heard of someone reporting a child missing by calling the non-emergency number to the police. (Will County's 56.1(a)(3) at ¶ 26). Detective Dobrowski found it unusual that Kevin Fox called the non-emergency number twice and hung up, before he spoke with the police on the third call. (Will County's 56.1(a)(3) at ¶ 26).

On June 6, 2004, officers from the Illinois State Police interviewed Kevin Fox as to his activities the early morning hours of June 6, 2004. (Will County's 56.1(a)(3) at ¶ 32).

Tomczak called his press secretary on June 6, 2004, to tell him about Riley Fox's disappearance. (Plaintiffs' Tomczak 56.1(b)(3)(c) at ¶ 22).

At about 3:30 p.m. on June 6, 2004, the body of Riley Fox was found in Forked Creek, several miles from the Fox residence. (Will County's 56.1(a)(3) at ¶ 33; Tomczak's 56.1(a)(3) at ¶ 37).

### The Autopsy

On June 7, 2004, an autopsy was performed on the body of Riley Fox by Dr. John Scott Denton, a Deputy Medical Examiner for the Cook County Medical Examiner's Office. (Tomczak's 56.1(a)(3) at ¶ 38; Will County's 56.1(a)(3) at ¶ 100). Dr. Denton is Board Certified in three areas of pathology: anatomic pathology, clinical pathology and forensic pathology. (Will County's 56.1(a)(3) at ¶ 100). Detectives Swearengen and Wachtl and two representatives of the Will County State's Attorney's Office – Assistant State Attorneys Deborah Mills and Michael Steadman – attended the autopsy. (Tomczak's 56.1(a)(3) at ¶ 41; Will County's 56.1(a)(3) at ¶ 107). Tomczak did not attend the autopsy. (Tomczak's 56.1(a)(3) at ¶ 39).

Dr. Denton stated, during and after the autopsy, that the cause of death was drowning. (Tomczak's 56.1(a)(3) at ¶ 45). Dr. Denton also told the Detectives that based on his autopsy findings, there was blunt trauma to Riley Fox's head. (Will County's 56.1(a)(3) at ¶ 108). After the autopsy, Dr. Denton told the coroner and other investigators, which included the Detectives present, that there were injuries to Riley Fox's vaginal area, which he believed were caused by

7

either a finger or something the size of a pen or pencil. (Tomczak's 56.1(a)(3) at ¶ 44; Will County's 56.1(a)(3) at ¶ 105). During the autopsy, a black light was used in the examination of Riley Fox's body to identify and locate any semen or saliva. (Tomczak's 56.1(a)(3) at ¶ 42; Will County's 56.1(a)(3) at ¶ 106). This examination did not reveal anything that lead Dr. Denton to believe there were any body fluids, such as semen or saliva, on Riley Fox's body. (Tomczak's 56.1(a)(3) at ¶ 42). At the autopsy, Detective Swearengen learned Riley had duct tape across her mouth and that there was residue of tape on her forearms. (Will County's 56.1(a)(3) at ¶ 107).

After the autopsy, Tomczak spoke by telephone with Patrick O'Neill, the Will County Coroner. (Tomczak's 56.1(a)(3) at ¶ 48). O'Neill advised Tomczak of the results of the autopsy, including the various findings and the cause of death, which was drowning. (Tomczak's 56.1(a)(3) at ¶ 48). During that conversation, O'Neill advised Tomczak that Riley Fox had been sexually assaulted. (Tomczak's 56.1(a)(3) at ¶ 48).

After the completion of the autopsy, Dr. Denton prepared an autopsy report, entitled "Report of Post Mortem Proceedings." (Tomczak's 56.1(a)(3) at ¶ 46; Will County's 56.1(a)(3) at ¶ 101). In the "Evidence of Injury" section of the Report, it states:

11. On the posterior inner labial at the 12 o'clock position is an abraded red purple superficial laceration with underlying subcutaneous hemorrhage, 0.3 by 0.25 inches.
12. Around the vaginal introitus is circumferential red and purple abrasion without hymen present, 0.4 by 0.4.
13. Within the posterior inner vaginal mucosa between the uterine cervix and the vaginal introitus are two vertical dark red purple abraded superficial lacerations, 0.5 by 0.1 and 0.3 by 0.1 inch, with submucosal hemorrhage.
14. On the right side of the head over the parietal skull are two patches of thin red subgaleal hemorrhages, 1.75 by 1.5, and 1.5 by 1.0 inches.
15. On the top of the head slightly right of the vertex is a thin patch of red subgaleal hemorrhage, 1.75 by 1.75 inches.

8

16. On the upper back of the head in the midline beneath the vertex is a patch of thin red subgaleal hemorrhage, 2.3 by 1.3 inches.

(Will County's 56.1(a)(3) at ¶ 101). The "Summary Diagnosis" section of the Report states, in relevant part, as follows:

\* \* \*

3. Subgaleal hematomas of the top and right side of the head.
   \* \* \*
8. Duct tape on the lower face over the mouth.
9. White tape residue on the forearms.
   \* \* \*

(Will County's 56.1(a)(3) at ¶ 103). The "Opinion" section of the Report of Postmortem Examination states, in relevant part: "The cause of death in this 3-year-old white female child, Riley A. Fox, is due to Drowning." (Will County's 56.1(a)(3) at ¶ 104; Tomczak's 56.1(a)(3) at ¶ 46).

## The Investigation

On the evening of June 6, 2004, a meeting was held at the Wilmington Emergency Service Disaster Agency building, where officers from the Illinois State Police shared the information they had obtained up to that point with other police agencies, including the Will County Detectives who were present. (Will County's 56.1(a)(3) at ¶ 34). Among other things, Detective Swearengen, who was present, recalls the Illinois State Police informing the Will County Detectives that Melissa Fox had said to Kevin Fox, upon her arrival to Wilmington on the morning of June 6, 2004, a statement to the effect of "you better not be involved in this" or "what did you do"; Melissa Fox denies making this statement. (Will County's 56.1(a)(3) at ¶ 34; Pl's Resp. to Will County's 56.1 at ¶ 34).

9

On June 6, 2004, it was determined that the Will County Sheriff's Department had jurisdiction in the case and would be conducting the investigation into the murder of Riley Fox. (Tomczak's 56.1(a)(3) at ¶ 50). The Illinois State Police Investigative Reports related to Riley Fox became part of the Will County Sheriff's Investigative File. (Will County's 56.1(a)(3) at ¶ 35). On June 6, 2004, Detective Swearengen was assigned to be lead detective on the case. (Tomczak's 56.1(a)(3) at ¶ 51).

On June 7, 2004 a meeting was held at the offices of the Will County Sheriff's Department. (Tomczak's 56.1(a)(3) at ¶ 52). That meeting was attended by the detectives working on the case; their supervisors; and representatives of the Will County State's Attorneys Office ("WCSAO"), including Tomczak and Ken Zelazo, an attorney with the WCSAO who reported to Tomczak. (Tomczak's 56.1(a)(3) at ¶¶ 12, 52).

In the early-morning hours of June 6, 2004, the Detectives obtained a surveillance videotape from the Wilmington Mobil Gas Station ("the Mobil Station"). (Tomczak's 56.1(a)(3) at ¶ 74; Will County's 56.1(a)(3) at ¶ 52). The Mobil Station, located at Route 53 (Baltimore Street) and Kankakee Street, is only 0.74 miles from the Fox residence. (Will County's 56.1(a)(3) at ¶ 54). Camera angle eight (8) on the surveillance videotape captured traffic that passed by the Mobil Station on Baltimore Street, Illinois Route 53. (Will County's 56.1(a)(3) at ¶ 55). Detective Dobrowski wrote a report regarding obtaining and copying the surveillance video from the Mobil Station from the morning hours of June 6, 2004. (Tomczak's 56.1(a)(3) at ¶ 74; Will County's 56.1(a)(3) at ¶ 53). Swearengen, Guilfoyle, Wachtl and Dobrowski testified at depositions that the expert they consulted, Chicago Police

10

Officer David Heppner, advised them that the vehicle's appearance on the Mobil Station tapes tended to suggest the guilt of Kevin Fox. (Pls' Will County 56.1(b)(3)(c) at ¶ 49).

Officer Heppner testified that he stated, "You couldn't rule either way . . . Basically, [the Mobil Station tape] was inconclusive the way it tested out. (Pls' Will County 56.1(b)(3)(c) at ¶ 50). The Mobil Station tape could not be enhanced to show the driver. (Pls' Will County 56.1(b)(3)(c) at ¶ 49).

On June 7, 2004, an attorney, Ryan Stephan, sent a letter to the Will County Sheriff's Department, which stated that he was representing the Fox family and that no further questioning of any family member should occur without his knowledge and attendance. (Pls' Tomczak 56.1(b)(3)(c) at ¶¶ 28, 29).[4]

In mid-June, Lieutenant Tapper approved the request for Tyler Fox to be brought in for a victim sensitive interview ("V.S.I.") at the Will County Children's Advocacy Center. (Tomczak's 56.1(a)(3) at ¶ 57). Detective Swearengen testified that the purpose of requesting that Tyler Fox be brought in for a V.S.I. was to determine if he had seen anything the night of Riley's disappearance. (Tomczak's 56.1(a)(3) at ¶ 58).

On June 22, 2004, Kevin, Melissa and Tyler Fox came in to the Will County Sheriff's Office for the purpose of going to the Will County Children's Advocacy Center for Tyler Fox's V.S.I. (Tomczak's 56.1(a)(3) at ¶¶ 61, 62; Will County's 56.1(a)(3) at ¶ 39). On that date, Tyler

---

[4] Tomczak filed a motion to strike the affidavit of Ryan Stephan on the grounds that Stephan has not yet been deposed (discovery is on-going) and because his affidavit, which states, "I was retained by Kevin Fox on June 7, 2004," is contradicted by the deposition testimony of both Kevin and Melissa Fox. However, as Ryan Stephan's affidavit does not contradict his own prior testimony, and Tomczak cites no authority for the proposition that only persons who have been deposed may submit affidavits to the Court, Stephan's affidavit is properly considered by the Court. On this ground, Tomczak's motion to strike is overruled.

11

was six-years-and-11-months-old. (Will County's 56.1(a)(3) at ¶ 37). Kevin, Melissa and Tyler Fox first spoke with Detective Swearengen and Detective Wachtl at the Sheriff's office and then proceeded to the Will County Children's Advocacy Center, where Tyler was to be interviewed, alone, by Mary Jane Pluth, a forensic interviewer employed by the Will County State's Attorney's Children's Advocacy Center. (Tomczak's 56.1(a)(3) at ¶¶ 61, 62; Will County's 56.1(a)(3) at ¶¶ 4, 39).

Tyler's interview was conducted in a room with a one-way mirror on the wall; behind the mirror is a room where others may observe and listen to the interview and communicate with the interviewer through a microphone connected to the interviewer's earpiece. (Tomczak's 56.1(a)(3) at ¶ 62). Assistant State's Attorneys, Deborah Mills and Misty Cavanaugh, attended and observed Tyler Fox's V.S.I. but did not actively participate; they did not have a conversation with Mary Jane Pluth prior to the interview, and they left at the conclusion of the interview without speaking to the detectives. (Tomczak's 56.1(a)(3) at ¶ 63).

After the V.S.I., Tyler Fox was not visibly upset; and Kevin, Melissa, and Tyler Fox and the Detectives returned to the Will County Sheriff's Office. (Tomczak's 56.1(a)(3) at ¶ 65; Will County's 56.1(a)(3) at ¶¶ 41, 42). Detective Swearengen and Detective Wachtl talked with Melissa and Kevin Fox while Detective Guilfoyle played catch with Tyler back at his office. (Tomczak's 56.1(a)(3) at ¶ 65; Will County's 56.1(a)(3) at ¶ 44).

Detectives Swearengen, Wachtl, Guilfoyle, and Ruettiger and Melissa, Kevin and Tyler Fox then left the office, stopped for lunch, and then proceeded to the Fox residence. (Tomczak's 56.1(a)(3) at ¶¶ 68, 69; Will County's 56.1(a)(3) at ¶ 46). The Detectives wanted to see if a visit to the Fox home would help trigger Tyler's memory. (Tomczak's 56.1(a)(3) at ¶ 68;

12

Will County's 56.1(a)(3) at ¶ 45). At the Fox residence, Detective Guilfoyle and Detective Wachtl spoke with Tyler Fox inside the house while Kevin and Melissa Fox remained outside with Detective Swearengen and Detective Ruettiger. (Tomczak's 56.1(a)(3) at ¶ 70; Will County's 56.1(a)(3) at ¶ 47). Neither Melissa nor Kevin Fox were present to hear the conversation between Tyler Fox and Detective Wachtl and Detective Guilfoyle inside the Fox residence. (Tomczak's 56.1(a)(3) at ¶ 71; Will County's 56.1(a)(3) at ¶ 48). Detective Guilfoyle wrote a report on June 22, 2004, purportedly detailing his conversation with Tyler Fox (the parties dispute the accuracy of the contents of the report). (Tomczak's 56.1(a)(3) at ¶ 73; Will County's 56.1(a)(3) at ¶ 43).

On October 25, 2004, Lieutenant Tapper, Sergeant Hayes, and Deputy Chief Ficarello had a meeting at the investigative offices to discuss the status of the investigation. (Tomczak's 56.1(a)(3) at ¶ 77). At that meeting, those present decided to bring Kevin Fox in for further questioning. (Tomczak's 56.1(a)(3) at ¶ 77).

On October 26, 2004, Detective Swearengen asked Melissa and Kevin Fox to come to the Criminal Investigation Division of the Will County Sheriff's Department. (Williams' 56.1(a)(3) at ¶ 12; Tomczak's 56.1(a)(3) at ¶ 80; Will County's 56.1(a)(3) at ¶ 67). Detective Swearengen testified that he talked to Kevin Fox and said, "We would like to get together to go over the investigation with you; there are some things we would like to talk to you and Melissa about." (Pls' Will County 56.1(b)(3)(c) at ¶ 13). Kevin Fox testified that Detective Swearengen contacted him and advised him that he had "some important things to tell" Kevin and Melissa Fox. (Pls' Will County 56.1(b)(3)(c) at ¶ 13).

13

Kevin and Melissa Fox arrived at the Will County Sheriff's Department about 6:50 p.m. on October 26, 2004. (Tomczak's 56.1(a)(3) at ¶ 80; Will County's 56.1(a)(3) at ¶ 67). Kevin Fox remained at the Will County Sheriff's Department offices continuously from his arrival on October 26, 2004, until 9:20 a.m. the next morning, October 27, 2004. (Tomczak's 56.1(a)(3) at ¶ 80; Will County's 56.1(a)(3) at ¶ 67). During the time that Kevin Fox was at the Will County Sheriff's Department, he was confined in two small identical rooms with no windows and a low ceiling. When Kevin Fox was left alone, the door was always locked. (Pls' Will County 56.1(b)(3)(c) at ¶ 14). Sheriff Kaupas testified that it was conveyed to him that as the investigators were doing their interview of Kevin Fox on October 26-27, 2004, "some of them came up with the instinct that he might be the suspect." (Pls' Will County 56.1(b)(3)(C) at ¶ 5).

Kevin Fox signed a *Miranda* Waiver on October 26, 2004, shortly after he arrived at the Criminal Investigation Division of the Will County Sheriff's Department. (Will County's 56.1(a)(3) at ¶ 68). The Detectives then began interviewing Kevin Fox. (Williams' 56.1(a)(3) at ¶ 12). Kevin Fox testified that during the interrogation, Detective Swearengen and other detectives told Kevin that the lumps on Riley's head matched Kevin's hands and that certain fibers tied Kevin to the murder. (Pls' Will County 56.1(b)(3)(c) at ¶ 27). Kevin Fox also testified that during the interrogation, Detective Swearengen came into the room "all out of breath" and told Kevin that he has been going back and forth to the courthouse and was "excited" because he had been talking with the State's Attorney. (Pls' Will County 56.1(b)(3)(c) at ¶ 36;

14

Pls' Tomczak 56.1(b)(3)(c) at ¶ 39). Kevin Fox testified that Detective Swearengen said that the State's Attorney had outlined a potential deal, wherein, if Kevin Fox confessed, "instead of getting 30 years to life, [Kevin Fox] would get involuntary manslaughter," which carried a sentence of only three to five years. (Pls' Will County 56.1(b)(3)(c) at ¶ 36; Pls' Tomczak 56.1(b)(3)(c) at ¶ 39).

During the course of the interview, Kevin Fox agreed to take a polygraph examination. (Will County's 56.1(a)(3) at ¶ 74). As of that date, the Will County Sheriff's Department did not have a polygraph examiner on staff. (Williams' 56.1(a)(3) at ¶ 14). As a result, Lieutenant Tapper called several neighboring police departments to locate an available polygraph examiner to administer a polygraph examination. (Williams' 56.1(a)(3) at ¶¶ 2, 16). Eventually, Lieutenant Tapper spoke with Richard Williams, a licensed polygraph examiner employed as a Deputy by the Cook County Sheriff's Police; and Williams agreed to administer a polygraph examination to Kevin Fox for the Will County Sheriff's Department. (Williams' 56.1(a)(3) at ¶¶ 2, 17; Will County's 56.1(a)(3) at ¶ 3).[5]

At the request of Williams, and prior to Williams' arrival at the Investigative Office, Kevin Fox was put in a room for approximately two hours before taking the examination. (Will County's 56.1(a)(3) at ¶ 76).

---

[5] Prior to October 26, 2004, Williams had never administered a polygraph examination for the Will County Sheriff's Department, did not know where the Will County Sheriff's Department Investigative Office ("Investigative Office") was located, and did not know any detectives from the Will County Sheriff's Department. (Williams' 56.1(a)(3) at ¶¶ 18-19).

15

Williams did not have any knowledge of Kevin Fox or the facts surrounding Riley Fox's murder prior to arriving at the Investigative Office on October 26, 2004. (Williams' 56.1(a)(3) at ¶ 22). When Williams arrived at the Investigative Office, he received a brief background of the circumstances surrounding Riley Fox's murder. (Williams' 56.1(a)(3) at ¶ 23). He was told a three-year-old girl was discovered in the river in Wilmington, her father reported her missing, her mother was not home at the time, there was no forced entry into the home, the girl had duct tape on her mouth, and the girl's death was caused by drowning in the river in Wilmington. (Williams' 56.1(a)(3) at ¶ 23). Williams was not told that the little girl was sexually assaulted, sustained injuries to her head, what time of day her body was discovered, or the existence of a Mobil gas station surveillance tape. (Williams' 56.1(a)(3) at ¶ 24).

The Detectives brought Kevin Fox into the polygraph room and left Williams and Kevin Fox alone until after the examination results were processed. (Williams' 56.1(a)(3) at ¶ 27; Will County's 56.1(a)(3) at ¶ 79). Williams testified that he then introduced himself to Kevin Fox in the polygraph room and immediately read out loud the document, entitled *Cook County Sheriff's Police Department Polygraph Unit Statement of Waiver of Rights and Liability* ("Polygraph Unit Release"). (Williams' 56.1(a)(3) at ¶ 28). The Cook County Sheriff's Police Department requires Williams to obtain each examinee's signature prior to the administration of the polygraph examination. (Williams' 56.1(a)(3) at ¶ 28). Kevin Fox signed the Polygraph Unit Release. (Williams' 56.1(a)(3) at ¶ 29). The Polygraph Unit Release sets forth Kevin Fox's name in full and the date, October 26, 2004. (Williams' 56.1(a)(3) at ¶ 30). It also states that the polygraph examination concerns the homicide of Riley Fox on June 6, 2004. (Williams' 56.1(a)(3) at ¶ 30). The Polygraph Unit Release provides that Kevin Fox voluntarily

submits to the polygraph examination and that he "release[s] and forever hold[s] harmless the County of Cook, the Cook County Sheriff's Police Department, their agents and/or employees and affiliates." (Williams' 56.1(a)(3) at ¶ 32). Williams testified that he showed Kevin Fox where he was to sign and print his name. Kevin Fox then signed and printed his name on the Polygraph Unit Release. (Williams' 56.1(a)(3) at ¶ 34). Kevin Fox testified that he did not read the Polygraph Unit Release before signing it. (Williams' 56.1(a)(3) at ¶ 35). Kevin Fox also signed a second *Miranda* Waiver prior to taking a polygraph examination on October 27, 2004. (Will County's 56.1(a)(3) at ¶ 69).

After Kevin Fox signed the Polygraph Unit Release and Miranda Waiver, Williams began administering the polygraph examination. (Williams' 56.1(a)(3) at ¶ 37; Will County's 56.1(a)(3) at ¶ 69). After the examination, Kevin Fox asked Williams if he passed. (Will County's 56.1(a)(3) at ¶ 80). Williams told Kevin Fox he had not. (Will County's 56.1(a)(3) at ¶ 80; Pls' Williams 56.1(b)(3)(C) at ¶ 3). Following the polygraph examination, Williams told the Detectives and Melissa Fox that Kevin Fox did not pass. (Williams' 56.1(a)(3) at ¶ 40; Tomczak's 56.1(a)(3) at ¶ 91; Will County's 56.1(a)(3) at ¶ 81; Pls' Williams 56.1(b)(3)(C) at ¶ 4).

Polygraph expert, Dr. David Raskin, reviewed the polygraph examination given to Kevin Fox and concluded, "No definitive conclusion can be reached about the truthfulness of Kevin Fox on the basis of the polygraph examination performed by Richard Williams." (Pls'

17

Williams 56.1(b)(3)(C) at ¶ 5). Dr. Raskin had also stated, "In all my years of experience, I have never encountered such a procedure; and I am not sure how he did it. These numerical scores cannot be used to represent actual numerical scoring performed independently by the examiner." (Pls' Williams 56.1(b)(3)(C) at ¶ 6).

Detective Hayes testified that by 4:00 a.m. on October 27, 2004, "it seem[ed] like Kevin [did not] want to confess." (Pls' Will County 56.1(b)(3)(c) at ¶ 18).

On the morning of October 27, 2004, at 8:22 a.m., Kevin Fox gave the Detectives a videotaped statement, implicating himself in the death of his daughter, Riley Fox (the parties disagree as to the voluntariness and truthfulness of this statement). (Tomczak's 56.1(a)(3) at ¶ 92; Will County's 56.1(a)(3) at ¶ 82). All of the Defendant Detectives – including Detective Hayes, Ruettiger, Guilfoyle, Dobrowski, Chief Deputy Moss, Deputy Chief Ficarello, Lieutenant Tapper and Illinois State Police Agent Vic Markowski – watched the monitor of the interrogation at some point in the evening. (Pls' Will County 56.1(b)(3)(c) at ¶ 45). Kevin Fox's videotaped statement included the following exchange between Kevin Fox ("KF") and Detective Scott Swearengen ("SS"):

> KF: I . . . went to go to the bathroom and I guess not slammed open the door, but the door was shut a little bit and uh, I pushed the door pretty hard and knocked Riley over and she hit her head. I guess I knocked her out unconscious and she wasn't moving.
>
> SS: This is, the bath, the bathroom door?
>
> KF: Yes.
>
> SS: Okay, um, what did you notice about Riley when you, when you flung the door open, the bathroom door, what happened to Riley at that point?
>
> KF: I just heard a thump.

18

SS:   You heard a thump? Earlier when we had talked to you, you thought it was possible her head maybe hit the tub or the floor?

KF:   Yeah.

SS:   Is that right? Okay, um, what, what happened to Riley at that point?

KF:   Uh, she was just laying there not moving.

SS:   Okay, how was Riley dressed at that time?

KF:   Um, she just had a t-shirt on.

SS:   Okay, what, what kind of t-shirt was that?

KF:   Pink flamingo on it.

SS:   Okay, did she have any other clothes on?

KF:   No.

SS:   And why did she not have any other clothes on?

KF:   Because she was using the restroom.

* * *

SS:   You thought you had killed her by flinging the door open to her and knocking her to the floor.

KF:   Yes.

SS:   What did you do at that point then?

KF:   I picked her up and went to the car, put her, laid her on the back seat.

SS:   And your car, that's the Ford Escape at that time?

KF:   Yeah.

SS:   Ok, go ahead.

KF: And uh, drove her to Sandy's, or by Sandy's, and then, uh, turned around.

        * * *

SS: Where did you go from there?

KF: I turned around and was heading to the hospital, but, then I was just so shaken up, I forgot Tyler was at the house and so I, uh, went down to Kahler Road.

SS: What was the purpose for going down Kahler Road, Kevin?

KF: Cause I didn't know what to do.

SS: Did you finally eventually decide of [sic] what to do?

KF: Yeah.

SS: And what was that?

KF: Um, put her in the creek.

(Will County's 56.1(a)(3) at ¶ 82). The night of October 26-27, 2004 was the first time that Kevin Fox told the Detectives that he watched a pornographic video in the early morning hours of June 6, 2004. (Tomczak's 56.1(a)(3) at ¶ 23; Will County's 56.1(a)(3) at ¶¶ 15, 72). Melissa Fox also learned about this activity for the first time on October 26, 2004, from the Detectives. (Will County's 56.1(a)(3) at ¶ 72).

In the videotaped statement, Kevin Fox corrects Detective Swearengen when he refers to the wrong vehicle:

SS: Okay, eventually you made some calls and you summoned the aid of police, is that correct?

KF: Yes.

SS: Okay, and everybody shows up and the search on for Riley. Um, I want to go back to uh, one thing, uh, the duct tape. You said you had retrieved it from your Blazer that you used to put on Riley?

KF: The Bronco, yeah.

SS: The Bronco, I'm sorry, thank you for correcting me there, um, you took the roll with you?

KF: Um hum.

(Will County's 56.1(a)(3) at ¶ 86). On October 26-27, 2004, Kevin Fox told the Detectives that his finger may have slipped by Riley's vagina when he put her in the car. (Will County's 56.1(a)(3) at ¶ 87).

Near the conclusion of the videotaped statement, Kevin Fox was asked if there was anything he would like to add before the statement was concluded; and he stated, "I'm just sorry what I've done, I didn't know, I didn't know she was alive and stuff, I just uh, I, I just didn't know what to do." (Will County's 56.1(a)(3) at ¶ 84). At the conclusion of the videotaped interview, the Detectives asked Kevin Fox how he felt the Detectives who had talked to him had treated him; and he stated, "Respectful, and you guys are a little pushy." (Will County's 56.1(a)(3) at ¶ 85).

Kevin Fox testified at his deposition that on October 26-27, 2004, Scott Swearengen asked him if Riley rolled off the couch when she was sleeping and hit her head. (Will County's 56.1(a)(3) at ¶ 96). Kevin Fox testified at his deposition that on October 26-27, 2004, Scott Swearengen asked him if Riley Fox walked in on him when he was watching the pornographic video and whether Kevin Fox got mad at Riley and hit her. (Will County's

21

56.1(a)(3) at ¶ 97). Kevin Fox testified at his deposition that he answered no to both questions and then told the Detectives the bathroom story. (Will County's 56.1(a)(3) at ¶ 98).

Shortly after the conclusion of the videotaped statement, Kevin Fox was transported to the Will County Jail. (Tomczak's 56.1(a)(3) at ¶ 94).

On the morning of October 27, 2004, at approximately 9:00 a.m., Detective Swearengen told Kevin Fox's father, Curt Fox, that Kevin Fox was going to be charged with First Degree Murder. (Pls' Will County 56.1(b)(3)(C) at ¶ 19).

Kevin Fox's attorneys instructed him to write notes and describe what occurred while he was at the Will County Sheriff's Investigative Office on October 26-27, 2004, so that Richard Ofshe, a coerced confession expert, could review what Kevin Fox had experienced prior to Richard Ofshe's interviewing Kevin Fox. (Will County's 56.1(a)(3) at ¶ 89). It took Kevin Fox two to three weeks to write his notes, which he did while in jail and prior to his meeting with Richard Ofshe. (Will County's 56.1(a)(3) at ¶ 90). Kevin Fox's notes contain the following statement:

> So Scott says he will stop me if something doesn't match up he says alright maybe it will be easier if we start from the beginning. How did you get to the point of throwing her in the water I just sat there crying trying to make something up and they said alright how did she get her panties off. And I said probably in the creek. They said no. They asked if I did anything to her after watching the porno. They said come on did you touch her. It's alright if you did. It wouldn't surprise us one bit. We hear it all the time and I said you guys are sick. Then it popped in my head that she was in the bathroom probably going to the bathroom and I opened the door and she fell and bumped her head.

(Will County's 56.1(a)(3) at ¶ 92).

Detectives Swearengen, Guilfoyle, and Hayes admitted that the Detectives did not take any steps to corroborate the videotaped statement after the statement was taken from Kevin Fox. (Pls' Will County 56.1(b)(3)(C) at ¶ 73).

Kevin Fox was charged with First Degree Murder, upon the recommendation of Assistant State's Attorney Ken Zelazo and upon the decision of Tomczak. (Pls' Will County 56.1(b)(3)(C) at ¶ 1; Tomczak's 56.1(a)(3) at ¶ 103).

Numerous items of potential evidentiary value were submitted to DNA Analyst Brendan Shea at the FBI in June 2004. (Pls' Will County 56.1(b)(3)(C) at ¶ 54). Analyst Shea expected Detective Hayes to provide him with information on the case in August, September and October of 2004; but Detective Hayes did not do so. (Pls' Will County 56.1(b)(3)(C) at ¶ 56).

Sheriff Paul Kaupas was quoted in a newspaper in regard to the Kevin Fox interrogation as saying, "We had a feeling. We rolled bones." (Pls' Will County 56.1(b)(3)(C) at ¶ 4). He was explaining that the investigators gambled when they called Kevin Fox in for a lengthy interview. (Pls' Will County 56.1(b)(3)(C) at ¶ 4).

### Dismissal of Charges Against Kevin Fox

On June 17, 2005, James Glasgow was the State's Attorney of Will County[6]; he advised the trial court that, " Bode Laboratories did an exclusionary test on male DNA that was found with the vaginal swabs. And if one loci does not match, a person is excluded; and there were

---

[6] On October 22, 2004, ten days prior to the Will County State's Attorney's election, Donald Tomczak, Defendant Tomczak's father, was indicted in the "Hired Truck Scandal." (Pls' Tomczak 56.1(b)(3)(c) at ¶ 35). Following the indictment, Defendant Tomczak lost his forty point lead over his opponent. (Pls' Tomczak 56.1(b)(3)(c) at ¶ 35). On November 2, 2004, Defendant Tomczak lost his bid for re-election to the office of Will County State's Attorney. (Pls' Will County 56.1(b)(3)(c) at ¶ 55).

seven loci that did not match. This is an absolute exclusion of Kevin Fox as a possible donor. Based on that, the State does not believe we have probable cause to continue holding Kevin Fox and clearly do not have sufficient evidence to meet our burden of proof beyond a reasonable doubt." (Pls' Will County 56.1(b)(3)(c) at ¶ 8). The charges against Kevin Fox were dropped and he was released from custody when the DNA evidence found in Riley Fox's vagina did not match Kevin Fox's DNA. (Will County's 56.1(a)(3) at ¶¶ 1, 115 ).

## LEGAL STANDARD

Summary judgment is appropriate under Rule 56 (c) when no genuine issue of material fact exists or when, drawing all factual inferences in favor of the nonmoving party, no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986) (*Liberty Lobby, Inc.*); *Popovits v. Circuit City Stores, Inc.*, 185 F.3d 726, 731 (7th Cir. 1999); *Cincinnati Ins. Co. v. Flanders Elec. Motor Serv., Inc.*, 40 F.3d 146, 150 (7th Cir. 1994). Disputed facts are material when they might affect the outcome of the suit. *First Ind. Bank v. Baker*, 957 F.2d 506, 507-08 (7th Cir. 1992).

One of the "principal purposes" of awarding summary judgment is to "isolate and dispose of factually unsupported claims or defenses . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (*Celotex*). Thus, although the moving party on a motion for summary judgment is responsible for demonstrating to the court that there is no genuine issue of material fact, the non-moving party must go beyond the face of the pleadings, affidavits, depositions, answers to interrogatories, and admissions on file to demonstrate, through specific evidence, that a genuine

24

issue of material fact exists and to show that a rational jury could return a verdict in the non-moving party's favor. *Celotex*, 477 U.S. at 322-27; *Anderson*, 477 U.S. at 254-56; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 923 (7th Cir. 1994).

## ANALYSIS

### Will County Defendants

At the core of the Will County Defendants' motion for partial summary judgment is their contention that the Detectives had probable cause to arrest Kevin Fox, either before he gave his statement or after he gave his statement. As a result, the Will County Defendants assert that they are entitled to summary judgment on Kevin Fox's claims in Count I (§ 1983 - due process); Count II (§ 1983 - false arrest); Count III (malicious prosecution); Count IV (intentional infliction of emotional distress); and Count V (false imprisonment). Moreover, the Will County Defendants assert that because Melissa Fox's claim in Count VII (loss of consortium) and Kevin Fox's and Melissa Fox's claims in Count IX (conspiracy) and the claims in Counts X (Indemnification) and Counts XI (*respondeat superior*) are derivative of the claims in Counts I-V, summary judgment is appropriate on those claims, as well.[7]

A police officer has probable cause to arrest when the facts and circumstances within the officer's knowledge are sufficient to warrant a prudent person to believe the suspect had committed an offense. *Booker v. Ward,* 94 F.3d 1052, 1057 (7th Cir. 1996). Whether probable

---

[7] Alternatively, the Will County Defendants assert that if the Court were to dismiss the federal claims, the Court should decline pendant jurisdiction on any remaining state law claims and dismiss those claims without prejudice.

cause exists is determined according to an objective test based upon "factual and practical considerations of everyday life on which reasonable and prudent [people], not legal technicians, act." *Wollin v. Gondert*, 192 F.3d 616, 623 (7th Cir. 1999). Although probable cause requires more than a bare suspicion that an individual has committed an offense, it does not require evidence to support a conviction; it does not even require that the officer believe it more likely than not that the person has committed a crime. *Hughes v. Meyer*, 880 F.2d 967, 969 (7th Cir. 1989).

An arrest occurs when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest. *United States v. Ienco*, 182 F.3d 517, 523 (7th Cir. 1999). Ascertaining the reasonableness of the suspect's belief that he is under arrest is typically a question of fact for the jury. *Posr v. Doherty*, 944 F.2d 91, 99 (2d Cir. 1991). The existence of probable cause turns on the information known to the officers at the moment the arrest is made, not on subsequent information. *Hebron v. Touhy*, 18 F.3d 421, 423 (7th Cir. 1994).

The Will County Defendants assert that they had probable cause to arrest Kevin Fox for the murder of his daughter *prior* to his interrogation on October 26 - 27, 2004, based on the following: (1) Kevin Fox and Tyler Fox were the last people with Riley Fox on June 6, 2004; (2) Kevin Fox did not call 911 the morning of June 6, 2004 – instead, he called 411 to obtain the non-emergency telephone number to the Wilmington Police Department; (3) Kevin Fox called the non-emergency number to the Wilmington Police Department two times and hung up before he spoke with the Wilmington Police Department on his third telephone call to that number the morning of June 6, 2004; (4) Kevin Fox's relaxed tone of voice with the Wilmington Police

26

Department when he reported his 3-year-old daughter missing on June 6, 2004; (5) the Wilmington Mobil Gas Station videotape that has images of a vehicle that appears to be the Fox vehicle on June 6, 2004; (6) Tyler Fox's statements on June 22, 2004; (7) the time line that Kevin Fox gave as to his return from Chicago to Wilmington on June 5-6, 2004, and the time of death as determined by the pathologist who conducted the autopsy of Riley Fox; (8) the demeanor of Kevin Fox on June 6, 2004, when he was first interviewed; (9) Melissa Fox's comments upon her return from Chicago to Wilmington on June 6, 2004, noted on the Illinois State Police Investigative Report; and (10) the autopsy revealed that only slight sexual assault to Riley Fox. (Will County's 56.1(a)(3) at ¶¶ 60, 61).

However, the Will County Defendants' Motion for Summary Judgment, on the grounds that they had probable cause to arrest Kevin Fox, must be denied because nearly all of the facts these Defendants deem relevant are in dispute, including (1) whether Kevin Fox and Tyler Fox were the last people with Riley Fox on June 6, 2004; (2) whether Kevin Fox's voice was relaxed when he telephoned the Wilmington Police Department on June 6, 2004; (3) whether the Wilmington Mobil Gas Station videotape has images of a vehicle that appears to be the Fox vehicle; (4) Tyler Fox's statements on June 22, 2004; (5) the demeanor of Kevin Fox on June 6, 2004, when he was first interviewed; (7) Melissa Fox's comments upon her return from Chicago to Wilmington on June 6, 2004, and the context and meaning of those statements; and (8) whether Kevin Fox called the Detectives during the course of the investigation. The parties do not even agree as to when Kevin Fox was placed under arrest on October 26 -27, 2004.

27

Further, assuming *arguendo*, that Kevin Fox was not placed under arrest until the morning of October 27, 2004, and his statements immediately prior thereto could further support probable cause, as the Will County Defendants maintain, there are material issues in dispute with regard to the events of October 26-27, 2004, including the voluntariness of Kevin Fox's statements, the statements made by the Detectives, whether the Detectives had physical conduct with Kevin Fox, whether Kevin Fox requested an attorney, whether Kevin Fox was offered or given food or drink, the results of the polygraph test, and whether Kevin Fox was shown pictures of Riley Fox's body in full rigor mortis.

The facts must be considered in the light most favorable to Plaintiffs, and all factual disputes must be resolved in their favor. *Liberty Lobby, Inc.*, 477 U.S. at 248. As the Plaintiffs have identified record evidence to support disputed elements of their claims, summary judgment would be inappropriate on those claims based on the Will County Defendants' claim that they had probable cause to arrest Kevin Fox, i.e., Counts I, II, III, IV, V, VII, IX, X and XI.

The Will County Defendants further assert that the Detectives are entitled to qualified immunity on Kevin Fox's § 1983 claims in Count I (§ 1983 due process) and Count II (§ 1983 false arrest). Government officials performing discretionary functions enjoy qualified immunity from suit to the extent that their conduct "could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638-39 (1987) (*Anderson*). Qualified immunity is determined using a two-part analysis: first, the court must determine whether the plaintiff has asserted the violation of a federal constitutional right; and,

28

second, if such a violation is asserted, the court must determine "whether the right was so clearly established at the time of the alleged violation that a reasonable officer would know that his actions were unconstitutional." *Sornberger v. City of Knoxville*, 434 F.3d 1006 (7th Cir. 2006).

The first inquiry turns on whether Kevin Fox's arrest was constitutionally valid, which depends upon whether, at the moment the arrest was made, the officers had probable cause to make it. As noted above, there are material factual issues in dispute with respect to this issue. However, any arrest made without probable cause does not necessarily deprive the officers of qualified immunity. The Supreme Court has recognized "that it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and . . . in such cases those officials – like other officials who act in ways they reasonably believe to be lawful – should not be held personally liable." *Anderson*, 483 U.S. at 641. Thus, it must be determined whether "a reasonable officer could have believed that probable cause existed" to make the arrest. *Hunter v. Bryant*, 502 U.S. 224 (1991). Based on the extensive number of material factual issues in dispute, this question cannot now be resolved. As a result, the Will County Defendants' motion for partial summary judgment is denied on the ground that they are entitled to qualified immunity.

Next, the Detectives assert they are entitled to immunity on Kevin Fox's and Melissa Fox's state law claims and punitive damage claims pursuant to the Illinois Tort Immunity Act, 745 ILCS 10/2-202 and 745 ILCS 10/2-102, respectively.

Section 2-202 provides that a public employee is not liable for his act in the execution or enforcement of any law unless such act constitutes willful and wanton conduct. 745 ILCS 10/2-202. Willful and wanton conduct is "a course of action which shows an actual or deliberate

intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others." 745 ILCS 10/1-210. A finding that an officer has probable cause to arrest negates a plaintiff's allegations that the officer acted in a willful and wanton manner. *Ross v. Mauro Chevrolet*, 369 Ill. App. 3d 794, 802, 861 N.E.2d 313, 320 (4th Dist. 2006). Defendants' argument is premised upon their assertion that probable cause existed. Once again, because there are material issues in dispute as to whether probable cause existed, Defendants' argument that they are entitled to immunity pursuant to Section 2-202 of the Tort Immunity Act is denied.

The Will County Defendants' argument in support of summary judgment that they are immune from punitive damages pursuant to Section 2-102 is likewise unavailing. Local government actors have immunity against punitive-damage claims when: (1) the defendants are "public officials" within the meaning of the statute; and (2) they were serving in an "official executive, legislative, quasi-legislative or quasi-judicial capacity" when they engaged in the actions that allegedly resulted in the plaintiff's injury. 745 ILCS 10/2-102. A "public official" is "a public employee who exercises discretion in the performance of uniquely governmental functions." *Reese v. May*, 955 F. Supp. 869, 875 (N.D. Ill. 1996) (*Reese*); *see also McNamara v. Foley*, 1998 WL 409412, at *9 (N.D. Ill. Jul. 15, 1998) (*McNamara*). Moreover, a police officer effectuating and enforcing the law "acts in an 'executive' capacity." *Reese*, 955 F. Supp. at 877; *McNamara*, 1998 WL 409412, at *9. However, § 2-102 does not shield any and all actions taken by an on-duty police officer who is enforcing the law. "At some point, a police officer can cross the line dividing discretionary law enforcement functions tailored to address the exigencies of a particular situation and actions taken outside the scope of employment." *McNamara*, 1998 WL

409412, at *10, *citing Reese v. May*, 955 F.Supp. 869, 875 (N.D. Ill. 1996). The factual disputes in this case, in particular with regard to the actions of the Will County Defendants, are many. Thus, weighing the facts in the light most favorable to Plaintiffs, for purposes of summary judgment analysis, raises a factual issue as to whether or not the Will County Defendants were acting outside the scope of their official employment during the investigation of the Riley Fox murder. Therefore, summary judgment on the punitive-damage claims is denied.

Finally, the Will County Defendants maintain that Melissa Fox's claim for conspiracy in Count IX fails; and summary judgment is appropriate. In Count IX, both Melissa and Kevin Fox allege that Williams, Pluth, and the Detectives conspired to falsely imprison, maliciously prosecute, and intentionally inflict emotional distress on Plaintiffs. (Fifth Amended Complaint, ¶¶ 111-115). To establish conspiracy, a plaintiff must state an independent, underlying cause of action. *Hurst*, 323 Ill. App. 3d at 823, 754 N.E.2d at 438. Here, Melissa Fox has no independent, underlying cause of action for the Detectives' alleged failure to find the real killer and actions in framing, imprisoning, and prosecuting Kevin Fox; and, therefore, her claim for conspiracy based on those allegations must fail. Summary judgment is granted on Melissa Fox's claim in Count IX to the extent it is based on conspiracy to falsely imprison and maliciously prosecute and denied to the extent it is based on conspiracy to intentionally inflict emotional distress.[8]

---

[8] The Will County Defendants also argue that Melissa Fox has failed to allege or establish a single fact showing the Williams, Pluth, and the Detectives, participated in a common scheme to commit intentional infliction of emotional distress on her, as required to allege conspiracy. *McClure v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 102, 133 (1999). However, as there are material issues in dispute with respect to the facts underlying the conspiracy to inflict emotional distress, the Will County Defendants' motion is denied on this ground.

## Defendant Jeffrey Tomczak

Plaintiffs' allegations against Tomczak can be divided into two categories: those actions undertaken prior to the charges against Kevin Fox ("pre-charging activity") and those undertaken after the charges were filed ("post-charging activity").[9] The pre-charging activity involves an alleged scheme by Tomczak and the Detectives to engage in conduct designed to fabricate evidence against, and coercively interrogate, Kevin Fox in order to obtain a knowingly false confession from him that would support charging him with the murder of his daughter Riley Fox.

With respect to Counts I and II, Tomczak alleges that summary judgment should be entered in his favor on all claims because: he is absolutely immune from liability for all post-charging activities; Plaintiffs have failed to produce any evidence to support the allegations of the pre-charging activity; and Tomczak is, therefore, entitled to qualified immunity for all pre-charging activities. Tomczak's absolute and qualified immunity arguments have been previously addressed and rejected by the Court, albeit in the context of a motion to dismiss. *See Fox v. Tomczak*, 04 C 7308, 2006 WL 1157466, *4 -5 (N.D. Ill. April 26, 2006) (*Tomczak*). Tomczak's motion with respect to the pre-charging activities, and his immunity therefore, is (as is that of the Will County Defendants) grounded in factual issues which are in dispute, including: (1) whether Tomczak had contact, or directed any member of his staff to have any contact, with any of the Detectives working the Riley Fox investigation between June 8, 2004 and Kevin Fox's

---

[9] Tomczak also asserts that the Eleventh Amendment bars the civil rights claims against him in Counts I and II. However, the Court has already ruled on this issue. Tomczak is sued in his individual capacity. *Fox v. Tomczak*, 04 C 7309, 2006 WL 1157466, *4 (N.D. Ill. April 26, 2006) (*Tomczak*) (holding that Tomczak is sued in his individual capacity and, therefore, the Eleventh Amendment provides no protection to Tomczak against Plaintiffs' Section 1983 claims).

arrest by the Will County Sheriff's Office; (2) whether Tomczak had knowledge of what physical evidence was collected and sent for forensic testing prior to the evidence being sent for testing; (3) whether Tomczak was involved in the decision to tell the FBI to stop all testing of the physical evidence; (4) whether Tomczak viewed the videotape of the Tyler Fox V.S.I. before the arrest of Kevin Fox; (5) whether Tomczak directed, planned, orchestrated, supervised, or participated in any way in any of the activities that occurred while Kevin Fox was being questioned on October 26-27, 2004; and (6) the timing of when Tomczak became aware of the events of October 26-27, 2004, which included the questioning of Kevin Fox, the polygraph examination, and the videotaped statement. Thus, on these grounds, Tomczak's motion for summary judgment is denied as to the pre-charging activities.

As to Tomczak's post-charging activity, Tomczak asserts that he has absolute immunity and that the Plaintiffs have failed to produce evidence to support the allegations of the post-charging activity alleged in Counts III, IV, V, VI, and VIII.

With respect to the malicious prosecution claim (Count III), false imprisonment claim (Count V), and conspiracy (Count IX) claims, as discussed above, there are material factual issues in dispute with respect to Tomczak's involvement and misconduct in the investigatory phase during which evidence was allegedly fabricated to create the probable cause required to initiate prosecution. In addition to the disputed issues identified above, the parties dispute Tomczak's actions at the probable cause hearing. Further, based on these factual disputes, it would be

33

improper to hold Tomczak's actions protected by the doctrine of absolute immunity. Summary judgment is improper on the ground that there are issues in dispute as to whether Tomczak acted outside his role as an advocate for the state and beyond the judicial nature and scope of his duties in pursuing Kevin Fox's prosecution.

With respect to the intentional infliction of emotional distress claims alleged in Counts IV and VIII (allegations that a state official fabricated false or misleading evidence of guilt or concealed exculpatory evidence, and other related conduct – facts in dispute, here), the alleged conduct is sufficiently "outrageous" to support an intentional infliction claim. *Carroccia v. Anderson*, 249 F. Supp. 2d 1016, 1028 (N.D.Ill. 2003). Thus, summary judgment as to Counts IV and VIII is denied.[10]

Tomczak also asserts that he is entitled to summary judgment on Count VI, which alleges defamation. The basis for the defamation claim against Tomczak is Tomczak's alleged statement to the public, "The evidence shows that the child was sexually abused during life." (Tomczak's 56.1(a)(3) at ¶ 104). Truth of this statement is in dispute. Tomczak asserts that the statement was true; the Plaintiffs assert that the pathologist who performed the autopsy stated there was no evidence that Riley had been sexually abused during her life and that the sexual assault was immediately before her death. Substantial truth is a question for the jury. *Global Relief Foundation, Inc. v. New York Times Company*, 390 F.3d 973, 987 (7th Cir. 2004). Thus, as the Plaintiffs have identified record evidence in dispute, summary judgment would be inappropriate

---

[10] Tomczak also asserts that neither Kevin Fox nor Melissa Fox have adequately shown that any statements or conduct by him were directed specifically at Plaintiffs. However, a claim for intentional infliction of emotional distress under Illinois law does not require specific direction to a party to be liable for intentional infliction of emotional distress. *Tomczak*, 2006 WL 1157466, *12.

34

on the defamation claim. Further, at this summary-judgment stage, it has not been shown that Tomczak is entitled to qualified immunity on Plaintiffs' defamation action. In order to have qualified privilege for communications, the statement must be published in a proper manner to proper parties. *Edelman, Combs and Latturner v. Hinshaw & Culbertson*, 338 Ill.App.3d 156 (1st Dist. 2003). Tomczak is not entitled to any immunity or privilege for there is a question of fact as to whether he was acting beyond the scope of his duties in making this statement.

Tomczak's Motion for Summary Judgment is denied.

### Defendant Richard Williams

Kevin Fox claims that Williams, in agreeing to administer and then administering a polygraph examination to Kevin Fox and other related conduct, conspired with other Defendants to coerce Kevin Fox into giving an inculpatory statement. There are material issues of fact in dispute with respect to Williams' participation in the alleged conspiracy; and, thus, summary judgment as to Kevin Fox's allegations in Count IX is denied. These disputed facts include: (1) whether the polygraph examination was administered after Kevin Fox had been interrogated and not given an opportunity to settle down and relax; (2) whether Williams falsely advised Kevin Fox that he had failed the polygraph examination when he had not; and (3) whether Williams accused Kevin Fox and attempted to force him to say that he had killed Riley Fox; and (4) whether Williams' conclusions from the polygraph were erroneous.

Williams also maintains that he is entitled to summary judgment because Kevin Fox signed a release of liability prior to taking the polygraph examination. Under Illinois law, "once the defendant establishes the existence of a release, legal and binding on its face, the burden shifts to the plaintiff to prove it invalid by clear and convincing evidence." *Simmons v. Blauw,* 263

35

Ill.App.3d 829, 832 (1st Dist. 1994). Here, Kevin Fox has shown that there are issues of fact in dispute in this regard, including whether or not the release was signed under duress. A release is invalid and a court will not enforce it if there has been fraud, duress, or, at least in some cases, unconscionability. *Carlile v. Snap-On Tools,* 271 Ill.App.3d 833 (4th Dist. 1995). Thus, here, too, summary judgment is denied.

Finally, Williams asserts that Melissa Fox cannot establish that Williams agreed with other Defendants to participate in a conspiracy to intentionally inflict emotional distress on her. Further, Williams asserts that summary judgment is appropriate as to Melissa Fox's claim for conspiracy because it cannot be based on the Detectives' alleged torts against her husband, Kevin Fox, or their failure to find the real killer of Riley Fox. There are material factual issues in dispute as to Williams' interactions with Melissa Fox following the administration of the polygraph examination – i.e., whether Williams left the room where the polygraph examination was being administered; returned with Detectives Swearengen, Guilfoyle, Wachtl, Hayes, Ruettiger, and Melissa Fox; showed Melissa Fox the computer screen; and told her Kevin had failed the test, which meant that Kevin "killed her daughter." Thus, for the reasons stated above, summary judgment is granted in favor of Williams on Melissa Fox's claim in Count IX to the extent it is based on conspiracy to falsely imprison and maliciously prosecute Kevin Fox and denied to the extent it is based on conspiracy to intentionally inflict emotional distress.

## CONCLUSION

For the foregoing reasons, (1) the Will County Defendants' Motion for Partial Summary Judgment is denied as to all counts, except as to Count IX as to Melissa Fox, as stated above; (2) Defendant Jeffrey Tomczak's Motion for Summary Judgment on Counts I - IX of the Fifth Amended Complaint is denied as to all counts, except as to Count IX as to Melissa Fox[11]; and (3) Defendant Richard Williams' Motion for Summary Judgment is denied as to all counts, except as to Count IX as to Melissa Fox, as stated above. This Memorandum Opinion and Order is filed under seal.

Dated: September 12, 2007

JOHN W. DARRAH
United States District Court Judge

---

[11] Tomczak did not raise the same argument related to Melissa Fox's conspiracy charge the other Defendants raised. See Tomczak's Motion for Summary Judgment at page 19-20. However, as Melissa Fox cannot allege a conspiracy claim to the extent it is based on conspiracy to falsely imprison and maliciously prosecute Kevin Fox, summary judgment is granted on this ground in favor of Tomczak. As with the other Defendants, Tomczak's Motion for Summary Judgment as to Count IX is denied to the extent it is based on conspiracy to intentionally inflict emotional distress.