

**AAIC**

**American Alternative Insurance Corporation**

555 College Road East, Princeton, NJ 08543-5241
Phone  888-729-2242
Fax    609-243-4558

May 17, 2006

**CERTIFIED MAIL –
RETURN RECEIPT REQUESTED**

Ms. Juli De Crane        Certified Mail RRR
Claim Supervisor
Specialty Risk Services
4245 Meridan Parkway
Aurora, IL 60504

Re:   *Kevin Fox and Melissa Fox v. Former Will County State's Attorney Jeffery Tomczak, et al.*, Case No. 04 C 7309 (U.S. District Court, N.D. Ill.)
      Policy No.:  60A2UB000044900
      Claim No.:   203640

Dear Ms. Juli De Crane:

American Alternative Insurance Corporation ("AAIC") has previously acknowledged receipt of the above-referenced matter to Butch Marros of Willis, and advised Mr. Marros that AAIC will be undertaking its investigation of this claim under a reservation of rights. A Fourth Amended Complaint was filed on October 6, 2005. On April 26, 2006, U.S. District Court Judge John W. Darrah issued a Memorandum Opinion and Order granting the motion to dismiss of Will County Sheriff Paul Kaupas, and denying the motions to dismiss of Defendant Jeffery Tomczak and the Defendant Detectives. The purpose of this letter is to advise the County of Will (the "County") of AAIC's position with respect to coverage for the Fourth Amended Complaint, and in particular, to inform the County that AAIC will continue to be monitoring this matter pursuant to a reservation of all of its rights under Commercial Excess Umbrella Policy No. 60A2UB000044900 issued to the County (the "AAIC Policy").

Prior to discussing the relevant policy provisions and coverage issues, we briefly summarize below the allegations that have been made by Kevin Fox and Melissa Fox in their Fourth Amended Complaint. Our summary of these allegations in no way implies that AAIC believes that these allegations are true or meritorious.

The Fox's Fourth Amended Complaint names the following individuals/entity as defendants: (1) Former Will County State's Attorney Jeffrey Tomczak ("Tomczak"); (2) Detective Edward Hayes ("Hayes"); (3) Detective Michael Guilfoyle ("Guilfoyle"); (4) Detective Scott Swearengen ("Swearengen"); (5) Detective John Ruettiger ("Ruettiger"); (6) Detective Brad Wachtl ("Wachtl"); (7) Detective David Dobrowski ("Dobrowski"); (8) Officer Jeanette Bishop-Green ("Bishop-Green"); (9) Richard Williams ("Williams"); (10) Mary Jane Pluth ("Pluth"); (11) Will County Sheriff Paul Kaupas (the "Sheriff"); and (12) the County.

According to the Fourth Amended Complaint, Tomczak is the Former Will County State's Attorney who directed the investigation into Riley Fox's murder, and the subsequent prosecution of Kevin Fox, during the period of June 6, 2004 through December 2, 2004



PLAINTIFF'S EXHIBIT
O

Page 2

Detectives Hayes, Guilfoyle, Swearengen, Ruettiger, Wachtl and Dobrowski are employed by the Will County Sheriff's Department, and were involved in the investigation of Riley's murder. Williams, who administered a polygraph test to Kevin Fox, is alleged to be an agent of the Sheriff's Department. Pluth, who interviewed the Fox's son, Tyler, is also alleged to be the Sheriff's agent. Bishop-Green is alleged to be an employee of the Sheriff's Department who worked at the Will County Jail. Each of these defendants has been sued in his or her individual capacity. It is alleged that each individually-named defendant was acting within scope of his or her employment, under color of law, at all relevant times.

The Fourth Amended Complaint alleges that, on June 6, 2004, Kevin Fox discovered that his daughter, Riley, was missing from the Fox home. Later that day, her body was found in a creek several miles from the Fox home. Riley's murder was investigated by the Will County Sheriff's Department. The following day, Mr. Fox and other family members allegedly provided DNA sample(s) to the Sheriff's Department. It is alleged that, rather than having an immediate DNA analysis performed at the Illinois State Crime Laboratory, Tomczak directed that the samples be shipped to the FBI.

It is alleged that, on June 22, 2004, the Foxes consented to their six-year-old son, Tyler, being interviewed by the Sheriff's Department, after they were informed that the purpose of the interview was to evaluate Tyler's potential need for psychological counseling. Pluth allegedly misled the Foxes as to the purpose of the interview, which was to coerce Tyler into implicating his father in Riley's murder. It is also alleged that certain of the defendant detectives were present for this interview, and that Det. Guilfoyle brought Tyler back to the Fox home and interrogated him there as well. The Foxes allege that Tyler was severely traumatized as a result of such treatment.

According to the Fourth Amended Complaint, the Sheriff's investigation was essentially dormant from June 22, 2004 to October 25, 2004. It is alleged that Tomczak, who was facing a tough re-election contest, was motivated to close this case by compelling Fox to confess to Riley's murder. Accordingly, with Tomczak's knowledge, approval and supervision, the defendant detectives allegedly met to discuss the planned coercion of Mr. Fox's confession.

The Foxes met with the officers on October 26, 2004 and were interrogated separately from 6:50 pm on the 26th until 9:20 am on the 27th. It is alleged that Mr. Fox was "tricked" into signing a *Miranda* waiver, and that the defendant detectives refused to allow him to call his father and ask that he get him an attorney. According to the Fourth Amended Complaint, the defendant detectives intimidated, coerced, confused and misled Mr. Fox to obtain his confession to Riley's murder. Mr. Fox allegedly was told that he was facing a first degree murder conviction, with at least thirty years in jail, but that if he confessed to Riley's murder being an "accident," he would receive only minimal jail time. The defendant detectives reportedly told Mr. Fox what to say in his confession. It is also alleged that defendant Williams administered an unreliable polygraph examination to Mr. Fox.

Apparently, only twenty minutes of Mr. Fox's interrogation were taped, which contravenes Illinois law. Moreover, no member of the Will County State's Attorney's office was

05/31/06 WED 14:11 FAX 1 815 774 6355    WILL CO HUMAN RESOURCES                    ☏004

Page 3

present for the interview. With respect to the detectives' interrogation of Mrs. Fox, it is alleged that the defendant detectives were verbally abusive to her, and that they repeatedly accused her husband of abusing and killing their daughter.

The Fourth Amended Complaint alleges that, at Tomczak's direction, misrepresentations were made to the grand jury that implicated Mr. Fox, and that the detectives who testified before the grand jury suppressed all exculpatory evidence. It is also alleged that Tomczak made no effort to independently corroborate the statements in Mr. Fox's confession, and that he failed to obtain the DNA test results before charging Mr. Fox with first degree murder, requesting a $25 million bond, and seeking the death penalty. According to the Fourth Amended Complaint, Tomczak made a number of misrepresentations to the media concerning Mr. Fox's arrest, and in particular, he falsely stated that Riley had a "history" of having been sexually abused.

Additionally, the Fourth Amended Complaint alleges that, on November 3, 2004, the day after Tomczak lost his election, one of the defendant detectives contacted the FBI and requested that all testing of Mr. Fox's DNA sample(s) be suspended. Tomczak allegedly left the Will County State's Attorney's Office on December 2, 2004. It is alleged that, after leaving office, Tomczak has continued to make false statements to the press regarding this case.

According to the Fourth Amended Complaint, one or more of the defendant detectives deliberately delayed in providing key evidence to the newly-elected Will County State's Attorney, James Glasgow. In particular, it is alleged that Defendant Hayes deliberately sent Mr. Fox's DNA sample to the wrong laboratory. In any event, it is alleged that, on June 16, 2005, the testing lab determined that the DNA found on Riley's body did not match that of Mr. Fox or of any other family members who had provided samples. On June 17, 2005, the Will County State's Attorney dropped the charges against Mr. Fox, and he was released from jail that day. Nonetheless, it is alleged that one or more of the defendant detectives have continued to publicly claim that Mr. Fox is guilty of Riley's murder, and that the DNA evidence was contaminated.

According to the Fourth Amended Complaint, Mr. Fox was incarcerated for 234 days. It is alleged that, during this time, he was verbally abused by several jail guards, including Bishop-Green.

The Fourth Amended Complaint contains the following eleven counts:

1. Count I (Kevin Fox)—Violation of Due Process Pursuant to Section 1983 (directed against all the individually-named defendants except Bishop-Green, Pluth and Williams);
2. Count II (Kevin Fox)—False Arrest Pursuant to Section 1983 (directed against all the individually-named defendants except Bishop-Green, Pluth and Williams);
3. Count III (Kevin Fox)—Malicious Prosecution (directed against all the individually-named defendants except Bishop-Green, Pluth and Williams);
4. Count IV (Kevin Fox)—Intentional Infliction of Emotional Distress (directed against all the individually-named defendants except Pluth and Williams);

Page 4

5. Count V (Kevin Fox)—False Imprisonment (directed against all the individually-named defendants except Bishop-Green, Pluth and Williams);
6. Count VI (Kevin Fox)—Defamation (directed against Tomczak only)
7. Count VII (Melissa Fox)—Loss of Consortium (directed against all the individually-named defendants except Bishop-Green, Pluth and Williams);
8. Count VIII (Melissa Fox)—Intentional Infliction of Emotional Distress (directed against Tomczak and Defendant Hayes);
9. Count IX (Kevin and Melissa Fox)—Conspiracy (directed against all the individually-named defendants except for Bishop-Green);
10. Count X (Kevin and Melissa Fox)—Indemnification (directed against the County); and
11. Count XI (Kevin and Melissa Fox)—Respondeat Superior (directed against the County and the Sheriff's Department).

As previously set forth, on or about April 26, 2006, the Court denied the motion(s) to dismiss filed by Tomczak and the defendant detectives. The Sheriff's motion to dismiss Count XI was granted.

The AAIC Policy issued to the County has effective dates of December 1, 2003 to December 1, 2004. The AAIC Policy has per occurrence and aggregate limits of liability of $5 million, and a Retained Limit of $10,000. Pursuant to the applicable Schedule of Underlying Insurance, St. Paul Policy No. GP06301134 (the "St. Paul Policy") is listed as a scheduled underlying policy. The St. Paul Policy appears to provide comprehensive general liability, law enforcement, and public officials coverage on an occurrence basis, with an Each Occurrence and Aggregate Limit of $1 million.[1]

The AAIC Policy generally provides coverage as follows

1  INSURING AGREEMENTS

We, the Company, in return for the payment of the premium, agree with you, as follows:

A. Coverage A - Excess Following Form Liability Over Underlying Claims Made or Occurrence Coverage

We will pay, on behalf of the insured, sums in excess of the amount payable under the terms of any Underlying Insurance as stated in the Schedule of Underlying Insurance, that the insured becomes legally obligated to pay as damages because of injury or damage to which this insurance applies.

This insurance is subject to the same terms, conditions, agreements, exclusions and definitions as the Underlying Insurance except as otherwise provided in this policy provided, however, that in no event will this insurance apply unless the Underlying

---

[1] According to the Schedule of Underlying Insurance, there is a $2 million aggregate limit for the comprehensive general liability coverage.

Page 5

Insurance applies or would apply but for the exhaustion of its applicable Limit of Liability.

\* \* \*

If the Scheduled Underlying Policy affords coverage on an occurrence basis then for this insurance to apply:

1. the injury or damage must be caused by an occurrence; and

2. a. the bodily injury or property damage; or,

b. the occurrence causing the personal injury, advertising injury, or professional liability injury;

must take place during the Policy Period.

\* \* \*

B. Coverage B - Umbrella Occurrence Based Liability Coverage Over Retained Limit

We will pay, on behalf of the insured, damages with respect to liability for loss in excess of the Retained Limit as specified in Item 4(d) of the Declarations, or the amount payable by any other insurance, whichever is greater, up to the applicable Limits of Insurance shown in the Declarations when liability is imposed on the insured by law or when liability is assumed by the insured under an insured contract because of:

1. bodily injury or property damage which occurs during the Policy Period and is caused by an occurrence; and

2. personal injury or advertising injury to which this coverage applies, caused by an occurrence committed during the Policy Period.

\* \* \*

Coverage B will NOT apply to any loss for which insurance is afforded under Coverage A or which arises out of subjects of insurance or exposures to loss for which Underlying Policies are required to be maintained under Section V - CONDITIONS, J. MAINTENANCE OF SCHEDULED UNDERLYING INSURANCE.

\* \* \*

III. DEFENSE PROVISIONS

A. We will assume charge of the settlement or defense of any claim or suit against the insured when:

1. the aggregate Limit of Liability of the applicable Scheduled Underlying Policy has been exhausted by payment of claims; or

2. damages are sought for bodily injury, personal injury, property damage, or advertising injury covered by this policy and to which no Underlying Insurance or other insurance applies:

Page 6

Provided there is no duty to defend under any Underlying Policy.

\* \* \*

D. In all circumstances for which paragraph A above is not applicable, we will NOT be obligated to assume charge or pay the expenses for the investigation, settlement or defense of any claim made, or suit brought, or proceedings instituted against any insured. We will, however, have the right in our sole discretion to participate in the defense and trial of any claims, suits or proceedings which relate to any occurrence that may involve this policy. If we avail ourselves of this right, we will do so at our expense.

\* \* \*

IV. EXCLUSIONS

The exclusions applicable to the Underlying Insurance also apply to this insurance.

Additionally, the following exclusions apply under:

\* \* \*

C. COVERAGE B ONLY

This policy will NOT apply:

\* \* \*

12. Coverage A Exclusion

Any liability arising out of any occurrence with respect to which any coverage for any other liability, injury or damage is provided by any Underlying Insurance shown in the Schedule of Underlying Insurance.

\* \* \*

V. CONDITIONS

\* \* \*

F. Duties In The Event Of Occurrence, Claim Or Suit

\* \* \*

2. Additionally, no insureds will, except at their own cost voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent, or make any admission of liability. All insureds must fully cooperate in the investigation, settlement or defense of the claim or suit.

\* \* \*

I. Maintenance Of Scheduled Underlying Insurance

While this policy is in effect you agree to maintain the Underlying Insurance listed in the Schedule of Underlying Insurance in full force

THIS MEANS THAT:

1. the Scheduled Underlying Policy(ies) may NOT be cancelled or NOT renewed by either you or the Underlying Insurer without notifying us;

2. renewals or replacements will NOT be more restrictive in coverage;

3. terms, conditions and endorsements of the Scheduled Underlying Policy(ies) will NOT materially change;

4. the risk of uncollectibility (in whole or in part) of the Scheduled Underlying Policy(ies) limits as listed in the Schedule of Underlying Insurance, or replacements thereof, whether because of financial impairment or insolvency of an Underlying Insurer or for any other reason, is expressly retained by you and is not in any way or under any circumstances insured or assumed by us; and

5. Limits of Insurance will NOT change except for any reduction in the aggregate limit or Limits of Insurance by payment of claims hereunder.

Your failure and/or your Underlying Insurer's failure to comply with this condition will NOT invalidate this policy but in the event of such failure, we will only be liable to the same extent as if there had been compliance with this condition.

J. Other Insurance

If other insurance applies to claims covered by this policy, the insurance under this policy is excess of such other insurance and we will NOT make any payments until the other insurance has been used up. This condition shall not apply, however, if the other insurance is specifically written to be excess over this policy.

\* \* \*

P. When Loss is Payable

This policy will NOT apply until the insured, or the insured's Underlying Insurer is obligated to pay the amount of the underlying limit or Retained Limit for an occurrence which is also covered by this policy. When the amount of loss has finally been determined we will promptly pay on behalf of the insured the amount of loss which falls within the terms of this policy

If we are required, or at our sole discretion elect, to pay any amounts on behalf of the insured within the Retained Limits, the first named insured listed in Item 1 of the Declarations will promptly reimburse us for any such amounts.

\* \* \*

VI. DEFINITIONS

A. Applicable to Coverage A only

The bold face terms appearing in this policy have the meanings as set forth in the Underlying Policy(ies); but, if no definition appears in such Underlying Policy(ies) or if Coverage B applies the definitions in paragraph B immediately below will apply.

B. Applicable to Coverage B

* * *

3. Bodily Injury

Means:

a. injury to the body, sickness or disease, including death resulting from any of these at any time, and if arising out of the foregoing, mental anguish, mental injury, disability, shock or fright;

* * *

6. Insured

Each of the following is an insured to the extent set forth below:

a. the named insured, and any Additional Named Insured stated in any Additional Named Insured Endorsement.

* * *

d. any person or organization (other than you) included as an insured in the Scheduled Underlying Insurance but NOT for broader coverage than is available to them under the Scheduled Underlying Insurance;

* * *

9. Occurrence

Means:

a. an accident, including continuous and repeated exposure to substantially the same general harmful conditions which results in bodily injury or property damage which is neither expected nor intended from the standpoint of the insured. All such exposure to substantially the same general conditions will be considered as arising out of one occurrence;

b. with respect to personal injury, only the offenses specified in DEFINITION 11. All damages arising out of substantially the same offense will be considered as arising out of one occurrence;

     \*   \*   \*

   10.   Other Insurance

*Means:*

Insurance other than Scheduled Underlying Insurance or insurance specifically purchased to be excess of this policy affording coverage that this policy also affords.

     \*   \*   \*

   11.   Personal Injury

*Means:*

One or more of the following offenses:

    a.   false arrest, false imprisonment, wrongful detention or malicious prosecution;

    b.   libel, slander, defamation of character, or oral or written publication of material that violates a person's right of privacy, unless arising out of advertising activities;

     \*   \*   \*

   14.   Professional Liability

*Means:*

any liability of the insured for damages covered by any Scheduled Underlying Insurance arising out of our [sic] attributible to any breach of duty, neglect, error, omission, misstatement, misleading statement or other wrongful act as defined in the Scheduled Underlying Insurance.

   15.   Property Damage

*Means:*

    a.   physical injury to tangible property which occurs during the Policy Period, including all resulting loss of use of such property resulting from it at any time; or

    b.   loss of use of tangible property which has NOT been physically injured or destroyed, provided such loss of use is caused by an occurrence during the Policy Period.

     \*   \*   \*

The AAIC Policy contains the following endorsements:

     \*   \*   \*

With respect to: COVERAGE A and COVERAGE B

05/31/06 WED 14:13 FAX 1 815 774 8355   WILL CO HUMAN RESOURCES   @011

Page 10

Aggregate Limits of Liability - Amendatory Endorsement

Coverage A is amended to include the following:

As respects the application of the Aggregate Limit stated in the Declarations the policy provision "Limits of Liability" is amended as follows:

In the event the underlying insurance provides coverage(s) which are subject to an aggregate limit of liability, our liability under this policy shall likewise be limited to the amount stated in the Information Page as the Aggregate Limit for all sums for which the insured is legally liable arising out of one or more occurrences during each annual period while this policy is in force, commencing from its effective date. The Aggregate Limit hereunder shall apply separately to each coverage for which the underlying insurance provides an Aggregate Limit.

With respect to: COVERAGE B

Police Or Law Enforcement Activities Exclusion

With respect to the operations or activities of any police department or any other law enforcement agency of the insured including any agent or employee thereof, this insurance does not apply to any liability arising out of any:

1. Bodily injury;

2. Property damage;

3. Personal injury, including false arrest, detention or imprisonment, wrongful eviction or entry or other invasion of the rights of privacy, libel, slander, defamation of character or humiliation;

4. Advertising injury;

5. Assault and battery or use of excessive force; or

6. Negligent acts, errors or omissions including the rendering or failure to render professional services, erroneous service of civil papers, violation of property rights or deprivation of any rights, privileges or immunities secured by the Constitution and the laws of the United States.

THIS POLICY IS SUBJECT TO THE FOLLOWING

With respect to: COVERAGE B

Public Officials Errors & Omissions Exclusion

This insurance does not apply to any liability arising out of the insured's activities as a municipality, municipal council or as an elected or appointed member or official.

* * *

With respect to: COVERAGE A and COVERAGE B

ILLINOIS AMENDATORY ENDORSEMENT

The endorsement modifies insurance provided under the following:

COMMERCIAL UMBRELLA POLICY

A. This policy does not apply to punitive or exemplary damages, except we shall have the duty to defend any suit against the insured seeking both compensatory and punitive or exemplary damages, with respect to such insurance as is afforded by this policy, but we shall not be obligated to pay any punitive or exemplary damages.

* * *

The AAIC Policy consists of excess follow-form coverage (Coverage A) and stand-alone liability coverage over a retained limit (Coverage B). Coverage A provides follow-form coverage in excess of the St. Paul Policy, which requires AAIC to pay those sums in excess of the amount payable under St. Paul Policy, which the Insureds become legally obligated to pay as damages because of injury or damage to which the AAIC Policy applies. Coverage A is subject to the same terms, conditions, agreements, exclusions and definitions as the St. Paul Policy, except as otherwise provided in the AAIC Policy. Thus, Coverage A of the AAIC Policy will be implicated only if the *Fox* lawsuit is covered under the St. Paul Policy, and if the limits of the St. Paul Policy are exhausted. AAIC has not been provided with any information regarding St. Paul's coverage position, although it requested this information from Mr. Marros on February 6, 2006 and April 14, 2006. Because AAIC has not been provided with any information indicating that this matter is covered under the St. Paul Policy, and that St. Paul's limits of insurance have been exhausted, Coverage A of the AAIC Policy is not presently implicated by the *Fox* lawsuit. AAIC, however, reserves all rights with respect to the terms, conditions, definitions and exclusions contained in the St. Paul Policy that are applicable now or may become applicable in the future.

Coverage B of the AAIC Policy provides umbrella occurrence-based liability coverage over a $10,000 retained limit. Thus, Coverage B will apply upon exhaustion of the specified self-insured retention if the damages sought are not covered by any underlying insurance, but are covered under the terms of the AAIC Policy. As previously set forth, AAIC has not been provided with any information regarding St. Paul's coverage position. Because AAIC cannot determine whether this matter involves damages that are not covered under the St. Paul Policy, but are covered under the terms of the AAIC Policy, it cannot come to a conclusion regarding its obligations under Coverage B. Nonetheless, AAIC takes this opportunity to advise the County of potential coverage issues and to reserve all of AAIC's rights and defenses, including the right

Page 12

to deny coverage under the AAIC Policy should no underlying insurance cover this claim and the applicable self-insured retention be exhausted.

Initially, we note that the term "Insured" is defined in the AAIC Policy as "any person or organization ... included as an insured in the Scheduled Underlying Insurance but NOT for broader coverage than is available to them under the Scheduled Underlying Insurance." Because AAIC has not been provided with a copy of the St. Paul Policy, it cannot determine whether and to what extent the individually-named defendants may qualify as "Insureds" under the AAIC Policy.

For coverage to potentially apply under Coverage B of the AAIC Policy, the Fox lawsuit must seek damages because of "Bodily Injury," "Property Damage," "Personal Injury," or "Advertising Injury" as those terms are defined in the AAIC Policy. The Fourth Amended Complaint does not appear to allege "Property Damage" or "Advertising Injury."

The AAIC Policy defines "Bodily Injury," in relevant part, as "bodily injury, sickness, disability or disease." "Bodily Injury" is also defined to include "mental injury, mental anguish, humiliation, shock or death" if arising out of bodily injury, sickness, disability or disease. The Fourth Amended Complaint does not appear to allege that Kevin or Melissa Fox sustained bodily injury, sickness, disability or disease as a result of the defendants' alleged conduct. AAIC, therefore, reserves its right to deny coverage to the extent that the "Insured(s)" incur liability for damages not because of "Bodily Injury."

Additionally, to the extent that the Fourth Amended Complaint could be construed to allege "Bodily Injury," such "Bodily Injury" must be caused by an "Occurrence." The term "Occurrence" is defined, in relevant part, as "an accident, including continuous or repeated exposure to conditions, which results in 'Bodily Injury' ... neither expected nor intended from the standpoint of the insured." To the extent the Fourth Amended Complaint does not allege any "Bodily Injury" caused by an "Occurrence," coverage will not be provided by the AAIC Policy.

The term "Personal Injury" is defined in the AAIC Policy as injury arising out of one or more of the enumerated "Personal Injury" offenses. Based on AAIC's review of the allegations in the Fourth Amended Complaint, it appears that the Fox lawsuit may allege, in part, injury arising out of the offenses of "false arrest, false imprisonment, wrongful detention or malicious prosecution" as well as "libel, slander, defamation of character"

Please note that any "Personal Injury" must take place during the December 31, 2003 – December 31, 2004 policy period of the AAIC Policy in order to implicate coverage. The AAIC Policy does not provide coverage for any liability because of "Personal Injury" taking place outside of its policy period. Moreover, all damages arising out of substantially the same "Personal Injury" offense will be considered as arising out of one occurrence.

Additionally, and as set forth above, the AAIC Policy contains the "Police Or Law Enforcement Activities Exclusion" Endorsement, which applies to Coverage B. Pursuant to this Endorsement, Coverage B of the AAIC Policy will not apply to liability arising out of bodily injury, personal injury, or negligent acts, errors omissions including civil rights violations, with respect to the operations or activities of the County's law enforcement agencies, or the

Page 13

agents/employees of these agencies. The AAIC Policy also contains a "Public Officials Errors & Omissions Exclusion" Endorsement, which applies to preclude coverage under Coverage B for liability arising out of insured's activities as a municipality, municipal council or as an elected or appointed member or official. Therefore, it appears that if Coverage B is implicated in this matter, one or both of these Endorsements would apply to preclude coverage for the *Fox* lawsuit.

Finally, the Fourth Amended Complaint seeks punitive and/or exemplary damages against the defendants. Please be advised that, pursuant to the Illinois Amendatory Endorsement, punitive or exemplary damages are not covered under either Coverage A or Coverage B. Therefore, AAIC will have no obligation to indemnify the County or any other potential "Insured" for any punitive or exemplary damages that may be awarded against them.

In sum, AAIC has determined that it has no present obligation to the County and other potential "Insureds" in connection with the *Fox* lawsuit. Accordingly, AAIC will continue to investigate and monitor this matter pursuant to a complete and full reservation of its rights under the AAIC Policy, including but not limited to its right to decline coverage and/or to seek declaratory relief at a later time.

As set forth above, further information regarding this matter is required to evaluate whether coverage is potentially applicable under the AAIC Policy and, if so, the extent of such coverage. Accordingly, AAIC requests that the County provide it with the following information and documentation as soon as possible:

- A complete copy of the St. Paul Policy;

- All correspondence between St. Paul and the County and/or between Willis and St. Paul with respect to coverage for the *Fox* lawsuit;

- The identification of the insurer(s) providing primary and excess liability coverage to the County for the December 1, 2004 to December 1, 2005 policy period;

- Information addressing whether the *Fox* lawsuit was tendered to the County's primary and excess liability insurers for the 2004—2005 policy period; and if so, provide all correspondence between the County and these insurers and/or between Willis and these insurers regarding coverage for the *Fox* lawsuit.

Please be advised that nothing contained herein should be construed as a waiver of any rights or defenses, whether or not stated herein, which AAIC may possess under the AAIC Policy and/or applicable law. It should be understood further that any actions taken by AAIC and/or its agents, representatives or attorneys do not constitute and are not intended as a waiver of any rights or defenses available to AAIC, whether or not stated herein, that may be available now or at any point in time. AAIC reserves its rights to supplement and/or amend its coverage position at any time.

05/31/06 WED 14:15 FAX 1 815 774 6355    WILL CO HUMAN RESOURCES                @015

Page 14

Should you have any questions regarding the above, please feel free to contact me.

Very truly yours,

Robert J. Katz
Vice President – Claims
On behalf of AAIC

cc: Butch Marros
Vice President
Willis
10 S. LaSalle Street, Suite 3000
Chicago, IL 60603