

# INVESTORS UNDERWRITING MANAGERS, INC.

Investors Plaza 310 Highway 35 South, Red Bank, New Jersey 07701-5921
(732) 224-0500  (800) 243-6869  Fax (732) 741-2266  www.markelcorp.com

> **RESERVATION OF RIGHTS**

VIA CERTIFIED MAIL R.R.R.
7005 1820 0004 1331 8577

October 9, 2006

County of Will, IL
302 North Chicago
Joliet, IL 60432

RE: Our Insured:          County of Will, IL
    Our Claim Number:     0076387
    Policy Number:        XO NJ 1822 03
    Policy Period:        December 1, 2003 to December 1, 2004
    Plaintiff             Kevin Fox and Melissa Fox

Dear Sir or Madam:

Investors Underwriting Managers, Inc. ("IUM") is the affiliated underwriting manager for Essex Insurance Company ("Essex"). Essex issued the captioned Excess Liability policy to the County of Will, IL. We have previously acknowledged receipt of the claim brought by Kevin Fox and Melissa Fox. The instant lawsuit titled: <u>Kevin Fox, Melissa Fox etal v. Former Will County State's Attorney Jeffrey Tomczak, Detective Edward Hayes etal</u> bearing Case Number 04 C 7309, is pending in the U. S. D. C. for the Northern District of Illinois, Eastern Division. Essex will investigate this claim pursuant to a full reservation of rights. By handling this matter under a reservation of rights, we reserve the right to investigate and deny coverage for any damages not covered under this policy. The following is an explanation of our position.

(Please refer to our Claim Number on all correspondence.)



PLAINTIFF'S EXHIBIT
E

## FACTUAL BACKGROUND

We understand that a Fourth Amended Complaint has been filed in connection with this matter. According to the Fourth Amended complaint, Jeffrey Tomczak is the former Will County State's Attorney who directed the investigation into Riley Fox's murder, and the subsequent prosecution of Kevin Fox, during the period of June 6, 2004 through December 2, 2004. Detectives Hayes, Guilfoyle, Swearengen, Ruettiger, Wachtl and Dobrowski are employed by the Will County Sheriff's Department and were involved in the investigation of Riley's murder. Williams, who administered a polygraph test to Kevin Fox, is alleged to be an agent of the Sheriff's Department. Pluth, who interviewed Fox's son, Tyler, is also alleged to be the Sheriff's agent. Bishop-Green is alleged to be an employee of the Sheriff's Department who worked at the Will County Jail. Each of these defendants has been sued in his or her individual capacity. It is alleged that each individually named defendant was acting within scope of his or her employment, under color of law, at all relevant times.

The Fourth Amended Complaint alleges that, on June 6, 2004, Kevin Fox discovered that his daughter, Riley was missing from the Fox home. Later that day, her body was found in a creek several miles from the Fox home. The Will County Sheriff's Department investigated Riley's murder. The following day, Mr. Fox and other family members allegedly provided DNA sample(s) to the Sheriff's Department. It is alleged that rather than having an immediate DNA analysis performed at the Illinois State Crime Laboratory, Tomczak directed that the samples be shipped to the FBI.

It is alleged that on June 22, 2004, the Foxes consented to their six year old son, Tyler, being interviewed by the Sheriff's Department, after they were informed that the purpose of the interview was to evaluate Tyler's potential need for psychological counseling. Pluth allegedly misled the Foxes as to the purpose of the interview, which was to coerce Tyler into implicating his father in Riley's murder. It is also alleged that certain of the defendant detectives were present for this interview, and that Detective Guilfoyle brought Tyler back to the Fox home and interrogated him there as well. The Foxes allege that Tyler was severely traumatized as a result of such treatment.

According the Fourth Amended Complaint, the Sheriff's investigation was essentially dormant from June 22, 2004 to October 25, 2004. It is alleged that Tomczak, who was facing a tough re-election contest, was motivated to close this case by compelling Fox to confess to Riley's murder. Accordingly, with Tomczak's knowledge, approval and supervision, the defendant detectives allegedly met to discuss the planned coercion of Mr. Fox's confession.

The Foxes met with the officers on October 26, 2004 and were interrogated separately from 6:50 pm on the 26th until 9:20 am on the 27th. It is alleged that Mr. Fox was "tricked" into signing a Miranda waiver, and that the defendant detectives refused to allow him to call his father and ask that he get an attorney. According to the Fourth Amended Complaint, the defendant detectives intimidated, coerced, confused and misled Mr. Fox to obtain his confession to Riley's murder.

Mr. Fox allegedly was told that he was facing a first-degree murder conviction, with at least thirty years in jail, but if he confessed to Riley's murder being an "accident," he would receive only minimal jail time. The defendant detectives reportedly told Mr. Fox what to say in his confession. It is also alleged that defendant Williams administered an unreliable polygraph examination to Mr. Fox.

Apparently, only twenty minutes of Mr. Fox's interrogation were taped, which contravenes Illinois law. Moreover, no member of the Will County State's Attorney's office was present for the interview. With respect to the detectives' interrogation of Mrs. Fox, it is alleged that the defendant detectives were verbally abusive to her, and that she repeatedly accused her husband of abusing and killing their daughter.

The Fourth Amended Complaint alleges that, at Tomczak's direction, misrepresentations were made to the grand jury that implicated Mr. Fox, and that the detectives who testified before the grand jury suppressed all exculpatory evidence. It is also alleged that Tomczak made no effort to independently corroborate the statements in Mr. Fox's confession, and that he failed to obtain the DNA test results before charging Mr. Fox with first degree murder, requesting a $25 million bond, and seeking the death penalty. According to the Fourth Amended Complaint, Tomczak made a number of misrepresentations to the media concerning Mr. Fox's arrest, and in particular, he falsely stated that Riley had a "history" of having been sexually abused.

Additionally, the Fourth Amended Complaint alleges that on November 3, 2004, the day after Tomczak lost his election, one of the defendant detectives contacted the FBI and requested that all testing of Mr. Fox's DNA sample(s) be suspended. Tomczak allegedly left the Will County State's Attorney's Office on December 2, 2004. It is alleged that, after leaving office, Tomczak has continued to make false statements to the press regarding this case.

According to the Fourth Amended Complaint, one or more of the defendant detectives deliberately delayed in providing key evidence to the newly elected Will County State's Attorney, James Glasgow. In particular, it is alleged that Defendant Hayes deliberately sent Mr. Fox's DNA sample to the wrong laboratory. In any event, it is alleged that on June 16, 2005, the testing lab determined that the DNA found on Riley's body did not match that of Mr. Fox or any other family member who had provided samples. On June 17, 2005, the Will County State Attorney dropped the charges against Mr. Fox, and he was released from jail that day. Nonetheless, it is alleged that one or more of the defendant detectives have continued to publicly claim that Mr. Fox is guilty of Riley's murder, and that the DNA evidence was contaminated.

According to the Fourth Amended Complaint, Mr. Fox was incarcerated for 234 days. It is alleged that during this time, several jail guards, including Bishop-Green, verbally abused him.

The Fourth Amended Complaint contains the following eleven counts:

1. Count I – (Kevin Fox) Violation of Due Process Pursuant to Section 1983 (directed against all the individually named defendants except Bishop-Green, Pluth and Williams);
2. Count II – (Kevin Fox) False Arrest Pursuant to Section 1983 (directed against all the individually named defendants except Bishop-Green, Pluth and Williams);
3. Count III – (Kevin Fox) Malicious Prosecution (directed against all the individually named defendants except Bishop-Green, Pluth and Williams);
4. Count VI – (Kevin Fox) Intentional Infliction of Emotion Distress (directed against all the individually named defendants except Bishop-Green, Pluth and Williams);
5. Count V – (Kevin Fox) False Imprisonment (directed against all the individually named defendants except Bishop-Green, Pluth and Williams);
6. Count VI – (Kevin Fox) Defamation (directed against Tomczak only);
7. Count VII (Melissa Fox) – Loss of Consortium (directed against all the individually named defendants except Bishop-Green, Pluth and Williams);
8. Count VIII (Melissa Fox) – Intentional Infliction of Emotional Distress (directed against Tomczak and defendant Hayes);
9. Count IX (Kevin and Melissa Fox) - Conspiracy (directed against all the individually named defendants except Bishop-Green);
10. Count X (Kevin and Melissa Fox) - Indemnification (directed against the County); and
11. Count XI (Kevin Fox) – Respondeat Superior (directed against the County and the Sheriff's Department).

## THE ESSEX INSURANCE COMPANY POLICY

Essex Insurance Company issued policy XONJ182203 with effective dates of 12/1/03- 12/1/04. The policy provides a limit of liability of $5 million per occurrence/annual aggregate. The Essex policy is excess over a controlling underlying policy issued by AAIC. The AAIC policy has a limit of liability of $5 million per occurrence/aggregate.

The Essex Insurance Company policy provides in pertinent parts:

Section A – Insuring Agreements

The Company hereby agrees to pay on behalf of the Insured that portion of Ultimate Net Loss in excess of the Underlying Insurance as shown in Item 4 of the Declarations, but only up to an amount not exceeding the Company's Limit of Liability as shown in Item 3 of the Declarations. Except for the Terms, Definitions, Conditions and Exclusions of this policy, the coverage provided by this policy shall follow the Insuring Agreements, Definitions, Conditions and Exclusions of the Controlling Underlying Insurance Policy as shown in Item 4 of the Declarations.

(Please refer to our Claim Number on all correspondence.)

By correspondence dated May 17, 2006, AAIC, the controlling underlying insurance carrier, agreed to monitor this matter pursuant to a reservation of rights under their policy. As the Essex policy incorporates the terms and conditions of the underlying AAIC policy, Essex incorporates by reference the May 17, 2006 letter by AAIC, a copy of which is attached hereto.

Essentially, AAIC reserves its rights to deny coverage based upon (1) the terms, conditions, definitions and exclusions contained in the AAIC's controlling underlying policy issued by St. Paul; (2) whether the individually named defendants qualify as "Insureds" under the AAIC policy; (3) whether the "Insureds" incur liability for damages not because of "bodily injury" as that term is defined in the AAIC policy; (4) "bodily injury" not caused by an "occurrence"; (5) "personal injury" that may have occurred outside of the AAIC policy effective dates; (6) AAIC policy's "Police Or Law Enforcement Activities Exclusion" Endorsement; (7) AAIC policy "Public Officials Errors & Omissions Exclusion" Endorsement; (8) AAIC policy Illinois Amendatory Endorsement, which precludes coverage for punitive damages

The Fourth Amended complaint seeks an award of punitive and/exemplary damages against the defendants. Please note that the Essex policy includes a Punitive Damages Exclusion endorsement, which states:

### PUNITIVE DAMAGES EXCLUSION

In consideration of the premium charged, its is hereby understood and agreed that this policy shall not apply to "Ultimate Net Loss" for any loss, cost and/or expense arising out of, resulting from, caused by, or in anyway contributed to any punitive damages, exemplary damages, treble damages, or any damages resulting from the multiplication of compensatory damages, including any other fines or penalties.

The punitive damages exclusion endorsement precludes coverage for punitive or exemplary damages. To the extent that there is an award of punitive and/or exemplary damages, Essex reserves the right to decline coverage for those damages.

As stated in the Essex policy's Insuring Agreements, except for the terms, definitions, conditions and exclusions of this policy, the coverage provided by this policy shall follow the Insuring Agreements, definitions, conditions and exclusions of the Controlling Underlying Insurance Policy.

The foregoing discussion of grounds for Essex Insurance Company's reservation of rights is not intended to be exhaustive or complete. Essex specifically reserves the right to supplement this correspondence should we become aware of the applicability of additional policy provisions if and when the underlying facts and applicable law so warrant.

We trust that you understand our position as set forth above. If any of the factual information relied upon by us in this letter is materially incorrect, or if you possess any additional information, which you believe provides a basis for coverage, please immediately contact the undersigned.

(Please refer to our Claim Number on all correspondence.)

If any of the factual information relied upon by us in this letter is materially incorrect, or if you possess any additional information which you believe provides a basis for coverage, please immediately contact the undersigned at (732) 391-8884.

Sincerely,

Jacqueline Armour
Claims Account Specialist

JA/ps

cc: Stewart Smith
10 South LaSalle Street, Suite 3200
Chicago, IL 60603
Att Bernadine Stewart

Butch Marros
Vice President
Willis
10 S. LaSalle Street, Suite 3000
Chicago, IL 60603

(Please refer to our Claim Number on all correspondence.)